IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

JIMMY DALE HUNSUCKER, JR.                                            PLAINTIFF

VS.                                            CAUSE NO. 3:10CV008-M-A

TIPPAH COUNTY, MISSISSIPPI, et al.                         DEFENDANTS

## **PLAINTIFF'S MEMORANDUM BRIEF IN SUPPORT OF HIS RESPONSE TO DEFENDANT BRANDON VANCE'S MOTION FOR SUMMARY JUDGMENT**

Former Tippah County Sheriff Brandon Vance ("Vance") has asked this Court to dismiss the lawsuit against him in his individual capacity claiming that there are no genuine issues of material fact as to whether he was responsible for the torture inflicted upon Plaintiff, Jimmy Hunsucker, Jr. by his deputies. Contrary to Vance's arguments and case citations, the facts preclude a finding of summary judgment in his favor and a jury must decide this issue.

### I.     **Summary Judgment Standard of Review**

Summary judgment is only appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as matter of law." Fed. R. Civ. P. 56. The party seeking summary judgment carries the burden of demonstrating there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 Sup. Ct. 2548, 2553, 91 L.E.D. 2d 265 (1986). After a proper motion for summary judgment is made, the non-movant must set forth specific facts

1

showing that there is a genuine issue for trial. *Hanks v. Trans-Continental Gas Pipe Line Corp.*, 953 F.2d 996, 997 (5th Cir. 1992). If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 337. As with any motion for summary judgment, the facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *King v. Chide,* 974 F.2d 653, 656 (5th Cir. 1992). Conclusory statements, speculation and unsubstantiated assertions are not competent summary judgment evidence and should not suffice to support a motion for summary judgment. See *Douglas v. United Services Auto Association*, 79 F.3d 1415, 1429 (5th Cir. 1996). The trial court must look at the record in the light most favorable to the non-moving party, *Pollen v. Columbia Broadcasting System, Inc.*, 436 U.S. 464, 473 (1962), and must resolve all reasonable doubts in favor of that party. *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980).

II.    **Facts**

Jimmy Hunsucker  ("Plaintiff" herein) was arrested by Tippah County Deputy Sheriff Will Rogers[1] on June 9, 2007 for misdemeanor offenses including DUI and careless driving. John Jenkins was a passenger in the Plaintiff's vehicle.[2] The Plaintiff and Jenkins were brought to the Tippah County Jail. The Plaintiff was then led to the "breathalyzer room" by Deputy William Rogers. Deputy Jeffery Rogers[3] of the Tippah County Sheriff's Department was present in this room along with Ripley Police Department Officers Ramone Rengel, Ken Walker and Karl Gaillard.[4] Plaintiff's Third Amended Complaint ¶'s 11-15.

---

[1] The Plaintiff denies that Rogers had a valid basis to stop and arrest him but the discussion and analysis of those issues are not necessary in this pleading.
[2] Jenkins' filed a lawsuit for his arrest as well. This case was settled. *See Jenkins v. Rogers*, 3:10cv00047.
[3] Jeffrey Rogers is Williams Rogers' son.
[4] The City of Ripley and their officers were sued and the case against them has been settled.

2

The Plaintiff was told to blow into the breathalyzer, but the Plaintiff refused the test and requested a blood test. The Plaintiff was refused a blood test.        Deputy      William      Rogers, Deputy Jeffery Rogers, Ripley Police Officer Ramone Rengel, Ripley Police Officer Ken Walker and Ripley Police Officer Karl Gaillard all became very upset when the Plaintiff refused to blow into the breathalyzer machine at the sheriff's department. As a result, the Plaintiff was pushed, choked and hit several times in his lower body by the deputies and the officers present in the "breathalyzer room". Furthermore, the Plaintiff was "drive stunned"[5] with the taser, or some other device, in the throat area by Deputy William Rogers. The Plaintiff was handcuffed, with the cuffs in front of his body, while in the "breathalyzer room" and while he was "drive stunned". Plaintiff's Third Amended Complaint ¶ 16- 17.

The Plaintiff was then taken outside of the "breathalyzer room" and handcuffed beside Jenkins, where he stayed for approximately two minutes, and then he was escorted to the "isolation room", also known as the "hole". Prior to taking the Plaintiff to the "hole", Deputy William Rogers called Sheriff Brandon Vance ("Vance" herein) and Vance was advised of the situation at the jail.  Vance advised Defendant William Rogers to take the Plaintiff to the "hole". The Plaintiff offered no resistance when he was taken to the "hole". Plaintiff's Third Amended Complaint ¶ 18. In fact, neither Will Rogers nor Jeffrey Rogers felt threatened by the Plaintiff nor did the Plaintiff attempt to strike or assault them in any way. Ex. A Excerpts of Will Rogers' Deposition p. 78, Ex. B, Excerpts of Jeffery Rogers' Deposition, p. 47.

Once in "hole", Deputy William Rogers told the Plaintiff to get on his knees and face the wall. Deputy William Rogers then removed the Plaintiff's handcuffs and directed him to put his

---

[5] The taser can be used in two ways. First, the officer can fire tiny probes at a suspect which are attached by wires to the taser gun. As long as the probes are in the person's body, the officer can simply pull the trigger on the taser to send 50,000 volts of electricity into the person's body. The "drive stun" method is when the tip of the taser is actually placed against the person's body and activated by pulling the trigger.

3

hands on his head. The Plaintiff complied with these instructions. At this point, Deputy William Rogers and Deputy Jeffery Rogers repeatedly tasered the Plaintiff at various spots all over his body. Deputy William Rogers utilized the "drive stun" feature of his taser gun to repeatedly taser the Plaintiff while Deputy Jeffery Rogers fired the prongs of his taser into the Plaintiff's body and repeatedly tasered him. At one point, Deputy Jeffery Rogers jerked the prongs out of the Plaintiff's body, reloaded his taser gun, fired the prongs into the Plaintiff's body a second time and began tasering him repeatedly. During the attack by Deputy William Rogers and Deputy Jeffery Rogers the Plaintiff lost control of his bowels and could only scream. Plaintiff's Third Amended Complaint ¶19

The Plaintiff was then instructed to remove all of his clothing. The Plaintiff questioned this and Deputy William Rogers then placed the taser to the Plaintiff's testicles and began counting to three. The Plaintiff immediately removed his clothing. Plaintiff's Third Amended Complaint ¶20.

Officer William Rogers then handcuffed the Plaintiff's ankles to the wall and left him there. The Plaintiff remained shackled until sometime the next day. The Plaintiff remained in the "hole" for two days, naked and unable to clean himself, prior to being released on Monday, June 11, 2007 at approximately 10:00 a.m. Upon information and belief, the Defendant Brandon Vance was made aware that the Defendant William Rogers left the Plaintiff in the "hole" in this condition. Plaintiff's Third Amended Complaint ¶21.

Upon release from jail, the Plaintiff sought medical treatment for the injuries that he received while incarcerated in the Tippah County Jail. Plaintiff's Third Amended Complaint ¶ 22.

4

The actions of Deputy William Rogers and Deputy Jeffery Rogers were reported to the Federal Bureau of Investigation which ultimately led to the prosecution of both men in the United States District Court for the Northern District of Mississippi. Deputy William Rogers and Deputy Jeffery Rogers both pled guilty to misdemeanor charges relating to their actions[6] and were sentenced to jail terms, with Deputy William Rogers also receiving a fine and supervised release. Plaintiff's Third Amended Complaint ¶23.

The Plaintiff filed suit against Tippah County, William and Jeffrey Rogers and Vance. Vance was sued in his individual capacity for instituting a policy which allowed deputies to use tasers on inmates without providing guidelines. Vance was also sued because the "hole" constitutes an unconstitutional condition of confinement for which Vance provided absolutely no written or oral guidelines.

### III.   Vance instituted unconstitutional policies at the jail which led to the Plaintiff's injuries, failed to supervise and train his deputies, and also violated duties imposed upon him by State law

It is clear that Vance was not in the jail when the Plaintiff was injured. However, Vance can still be liable in his individual capacity as a supervisor:

> Where a supervisory official had no direct personal participation in the alleged constitutional violation, 'the plaintiff must allege that the deprivation of his constitutional rights occurred either as a result of a subordinate's implementation of the supervisor's affirmative wrongful policies, or as a result of a breach by the supervisor of an affirmative duty specially imposed upon him by state law.'

*Bradley v. City of Jackson*, 590 F. Supp. 2d 817 (S.D. Miss. 2008). Vance can be held liable if it is shown that he "implement[s] a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.' " *Id.* quoting *Thompkins v. Belt,* 828 F.2d 298, 304 (5th Cir.1987) (citations omitted).

---

[6] Both William and Jeffrey Rogers pled guilty to civil rights violations.

*See also Clark v. McMillin,* 932 F.Supp. 789, 790 (S.D.Miss.1996) (in order to prevail on claim against sheriff in his individual capacity, plaintiff "must show that he affirmatively participated in acts that resulted in the alleged constitutional deprivation, or that he implemented unconstitutional policies that causally resulted in" injury). Alternatively, a supervisory officer not personally involved in the alleged wrongdoing can be liable if he failed to train or supervise the officers involved, if there is a causal connection between the alleged failure to supervise or train and the alleged violation of plaintiff's rights, and this failure to train or supervise constitutes deliberate indifference. *Thompson v. Upshur Cty.,* 245 F.3d 447, 459 (5th Cir. 2001) (citations omitted). *See also Miley v. Jones County Jail,* Civil Action No. 2:05cv2072-KS-MTP, 2007 WL 2159334, at *6 (S.D. Miss. July 25, 2007) and *Brooks v. Stringer,* Civil Action No. 2:04CV120KS-MTP, 2007 WL 1087487, at *12 (S.D. Miss. April 10, 2007) (recognizing that a plaintiff may establish individual liability of sheriff by showing that he "implemented an unconstitutional policy or lack of policy" which caused the plaintiff's injuries).

In Mississippi, a sheriff is in "charge of the… jail…of the premises..and of the prisoners in said jail. He shall preserve the said premises and prisoners from mob violence, from any injuries or attacks by mobs or otherwise…He shall keep the…jail and premises..in a clean and comfortable condition…" *Miss. Code. Ann.* § 19-25-69 (1972 as amended). In the Tippah County Jail, Vance failed to fulfill these statutory duties.

First, Vance placed a sign up in the jail which read "If you resist, you will be tased". Ex. C, excerpts from Vance's deposition, p.51. Jailers and other deputies were given no special instruction on when such tasering could occur or the difference between using such force on a person in jail as opposed to one who is out on the street. Ex. B, p. 23, Ex. C, p. 52-56.

Next, Vance instituted a policy allowing his deputies to place prisoners in an isolation cell known as "the hole". Prisoners were placed in "the hole" nude or partially nude and their legs were shackled. The chain shackling their feet was threaded through an eye bolt on the wall. Ex. C, p. 23. There was no set time limit on how long a person was to be kept in the "hole". Ex. C, p. 20, 22. The "hole" was not equipped with a toilet or running water. Instead inmates had to use the hole in the center of the cell to relieve themselves. Ex. C, p. 20-21. However, if the inmate had the misfortune of being shackled to the pipe like the Plaintiff was, he or she could not even utilize the hole to relieve themselves. Ex. C, p. 23.

### a. The tasering policy in the jail; failing to train and supervise taser usage

First and foremost, the Plaintiff has clearly alleged that his constitutional rights were violated when William and Jeffrey Rogers tasered him. Both William and Jeffrey Rogers pled guilty to civil rights violations. Vance's summary judgment motion does not contest even contest this. Thus, the question turns as to there is a genuine issue of material fact as to whether Vance is responsible for the Plaintiff's constitutional rights being violated.

Tasers are very painful police weapons. *See Hickey v. Reeder,* 12 F.3d 754, 757 (8th Cir. 1993) ("[A] stun gun inflicts a painful and frightening blow [that] temporarily paralyzes the large muscles of the body, rendering the victim helpless."); *see also Matta-Ballesteros v. Henman,* 896 F.2d 255, 256 n. 2 (7th Cir.1990) (noting that a taser "sends an electric pulse through the body of the victim causing immobilization, disorientation, loss of balance, and weakness"). Additionally, people have died due to tasering and have also suffered serious bodily injury and pain. The Plaintiff's expert, Ernie Burwell, described the tasering experience as follows:

> Two straightened fish hooks, approximately 1/4" long, penetrate the body to deliver the Taser Electro-Muscular Disruption Technology. However, when used in "drive-stun" or "contact tase" mode, the taser operates mainly as a pain compliance tool that does

7

> not incapacitate individuals in the same way as a taser used in "dart mode." Pulling and releasing the trigger on a Taser will initiate one 5 second cycle of approximately 50,000 volts at very low amps. There is no mechanism on the device prohibiting an officer from pulling and releasing it continuously, which would release continuous cycles of voltage into the subjects' body. ***In drive stun mode the Taser is much more painful and causes the skin to burn and become scarred.***

Mr. Burwell's Expert Designation, Ex. D, p. 3 (emphasis supplied).

Vance placed a sign in the Tippah County jail which advised inmates "if you resist you will be tased." Ex. C, p. 51. The problem with this sign is that "[n]ot every instance of inmate resistance justifies the use of force," *Hickey,* 12 F.3d 754 at 759 (8th Cir. 1993); *Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008) (Officers use of the taser on detained arrestee was unnecessary and excessive given that she was handcuffed and in foot restraints despite the fact that arrestee was acting unruly and would not obey order.)

Mr. Burwell, noted this about Vance's policy regarding tasering in the jail:

> The Sheriff's Department has created a custom and practice of excessive and unreasonable force by the use of the Taser, by placing placards in the jail for persons arrested to see. The placards state if you are uncooperative you will be Tased. With these kinds of ethics displayed by the department, it allows officers to freely use force without worry to any consequence to excessive force of Taser usage. The use of force permitted to be used is different for pretrial detainees like the Plaintiff and those convicted of crimes.

Ex. D, p. 17-18.

Vance did not have a policy, written or oral, instructing his officers under what circumstances the taser should be used in the jail. See Ex. B, p. 20-23 and Ex. C. p. 52. The Plaintiff alleged that he was tasered in the neck while handcuffed. Plaintiff's 3rd Amended Complaint ¶16-17. Vance had no prohibition against such actions. The National Law

Enforcement Policy Center's model policy on tasers states, "[t] he device is prohibited from being used ... on a handcuffed/secured prisoner, absent overtly assaultive behavior that cannot be reasonably dealt with in any other less intrusive fashion." *Richards v. Janis*, CV-06-3064-EFS, 2007 WL 3046252 (E.D. Wash. Oct. 17, 2007). Mr. Burwell, cited other sources in his expert report forbidding tasering on restrained persons:

> ### Department of Justice Investigation (Inglewood Ca.) regarding ConductiveEnergy Devices:
>
> *The IPD's Authorized Less Lethal Weapons and Ammunition policy, G.O. 1.1.5,includes the use of the M-26 / X-26 Advanced Taser. However, little direction is provided on how and when the Taser should be used. In accordance with best practices, the policy should specify that conductive energy devices ("ICED")should not be used against a subject in restraints.* **We recommend that the IPD prohibit the use of CEDs on restrained subjects.** *Moreover, when a subject is restrained and engages in active, violent resistance, the CED should be employed in rare circumstances, if at all. Indeed, a use of force policy matrix should adequately provide the officer with options and considerations other than the use of a CED. Moreover, the policy should require a high level of scrutiny in supervisory review whenever a CED is used on a restrained Subject.*
>
> ### Amnesty International:
>
> ### Shocked while restrained:
>
> *Amnesty International acknowledges that some restrained individuals can still be violent and aggressive towards officers, and that police officers have the right to defend themselves. However, the organization remains concerned about reports of individuals who are subjected to taser shocks when they are already handcuffed or have been placed in other mechanical restraints. The use of the taser in conjunction with restraints has been a common factor in many of the deaths reviewed by Amnesty International (see above and appendix). Moreover, AI considers that inflicting excruciating pain on a suspect who is restrained, and not able to pose a serious threat to their own life or that of police officers or members of the public, constitutes an excessive use of force, sometimes amounting to torture or other cruel, inhuman or degrading treatment.*

Ex. D, p. 4-5.

The scope of an individual's right to be free from punishment, and derivatively the basis for an excessive force action brought under § 1983, hinges on his status within the criminal

justice system. On one end of the spectrum are sentenced prisoners. The Eighth Amendment

protects these individuals only from the infliction of cruel and unusual punishment, which is

often defined in the prison context as the unnecessary and wanton infliction of pain. See

generally *Ingraham v. Wright, supra,* 430 U.S., at 670, 97 S.Ct., at 1412 (quoting *Estelle v.*

*Gamble, supra,* 429 U.S., at 103, 97 S.Ct., at 290) (citations omitted).

Pretrial detainees, like the Plaintiff, have not been convicted or sentenced and thus are not

yet "punishable" under the law. *See Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60

L.Ed.2d 447 (1979) ("[A pretrial] detainee may not be punished prior to an adjudication of guilt

in accordance with due process of law."). This means that pretrial detainees "may not be

'punished' by the state *in any way.*" *Wilson v. Williams,* 83 F.3d 870 at 875 (7th Cir. 1996)

(emphasis added). As such, pretrial detainees couch excessive force claims as violations of their

Fourteenth Amendment rights to due process, not infringements on the Eighth Amendment's ban

on cruel and unusual punishment. *See Brown v. Budz,* 398 F.3d 904 at 910 (7th Cir.2005); *Butera*

*v. Cottey,* 285 F.3d 601, 605 (7th Cir. 2002); *Pardue ex rel. Estate of Cole v. Fromm,* 94 F.3d

254, 259 n. 1 (7th Cir.1996). See also *Hare v. City of Corinth,* 74 F.3d 633 (5th Cir.

1996)(distinguishing between convicted prisoners and pretrial detainees).

Vance never instructed his jailers or deputies regarding constitutionally proper taser

usage in the jail and it shows. There was a pattern or practice of improper taser usage in Tippah

County. Vance himself improperly tasered mentally ill inmates who were in the "hole" on lunacy

writs and who were neither resisting or assaulting anyone. Ex. C Tr. 73-92 (taser used on Seth

Dore and Ronnie Duren (twice)). Such use of force was improper. See *Cabral v. County of*

*Glenn,* 624 F. Supp. 2d 1184, 1192 (E.D. Cal. 2009) (individual suffering from psychological

problems housed in isolation cell state constitutional cause of action against officer who utilized

taser against him while attempting to extraction. Individual was in his cell putting toilet water on his body and refused to leave his cell as ordered). Of course, Vance did not know any better as he was never trained on how to handle mentally ill persons. Ex. C, p. 73, 79. Defendant William Rogers also tasered mental patient Angie Cox while she was in the "hole". Ex. A, p. 41-42., Ex. C, p. 104-108. Vance condoned William Rogers' usage on Cox and did not even bother to obtain Cox' version of events. Ex C. 108.

Acting in accordance with the unconstitutional policy instituted by Vance, Defendants William and Jeffrey Rogers both testified that they were following Vance's, and the Jail's, policy when they tasered the Plaintiff while he was in the "hole". Ex. A. p. 30, Ex. B, p. 26. Neither deputy was disciplined by Vance which shows that the officers were acting within Vance's policy. Ex. C, p. 63-64.

Even though there was a policy regarding taser usage in general, it was not followed. According to Vance, an officer was required to complete an "Incident Form" after each taser usage. Ex. C, p. 71. However, according to the F.B.I. investigative reports, William Rogers utilized his taser on at least three (3) other occasions and did not complete an "Incident Form" on one of them (Eugene Pannell incident). As a result, Vance claims he was not even aware of one of the of the Pannell incident. William Rogers' taser usage, as reported, was improper and shows the need for retraining and/or discipline. On February 16, 2007 William Rogers tasered Angie Polly Cox in the stomach. Ms. Cox was a mentally ill person who was being held in the "hole". Ex. A, p. 22-23. According to the FBI Report, Ms. Cox' was stripped naked and put in the hole. See Ex. E, FBI Report on Cox. Ms. Cox banged on the door requesting to make a phone call. William Rogers then opened the cell door and shot her in the stomach with the taser. *Id.*

Rogers also used the taser on a citizen who was handcuffed in the back of the patrol car (Randy Barnes). Ex. A, p. 45-46, Ex. C, p. 94-95. William Rogers' version of events is different from Barnes' version which he later told the F.B.I. but Vance never bothered to interview Barnes to get his side of the story. Ex. C. p. 95 and Barnes report to the F.B.I. Ex. F. Acting as the internal affairs department, Vance determined the taser usage was proper. William Rogers' use of the taser on Eugene Pannell was also improper. Ex. G, Report of Pannell tasering. Mr. Pannell was handcuffed and causing no problems when he was tasered by William Rogers and Jeffrey Rogers. Jeffrey Rogers was not even certified to use a taser at the time Pannel was tasered, which could explain why the incident was not reported. However, if Vance simply instituted and followed a policy which required the taser to be downloaded on a weekly or monthly basis and then had the data reviewed, such incidents could be discovered and investigated. As Mr. Burwell opined

> Tippah County, Mississippi Sheriff Brandon Vance failed to investigate [the Hunsucker] incident and other similar incidents regarding the use of Tasers on individuals. The pattern and practices of the lack of supervision has become policy, allowing the deputies to use the Taser without any accountability. See download data for excessive usage and unaccounted activations. Sheriff Vance knew of the Taser incident with Randy Barnes but not Eugene Pannell.

Ex. D, p. 14.

The excessive, unaccounted for taser activations are particularly disturbing. Every time a taser is fired, data is recorded on the taser indicating the date, time and length of the taser discharge. Tasers should be downloaded after every use and/or monthly to ensure that there are no inappropriate or unaccounted for usages. However, as indicated by Mr. Burwell, the tasers at Tippah County had numerous unaccounted for taser usages.

12

During discovery, the Plaintiff requested the number of taser deployments by Tippah County deputies. There were only a few documented taser deployments. Deposition testimony of William Rogers, Jeff Rogers, and Brandon Vance, did not uncover any other unknown deployments. However, the taser data download provided in discovery revealed numerous, unexplained taser deployments. Copies of the taser data is attached as Ex. H. Vance was shown copies of the unexplained taser usages and had no explanation. Ex. C, Tr. 80-81, 110-116. One of Vance's taser incidents, Duren, was not even documented on the download. Ex. C, p. 80.

Vance testified that he was simply unaware that taser data could be downloaded. Ex. C, p. 51. After the Plaintiff's ordeal, Vance instituted a new policy requiring monthly data downloads. However, prior to this, Vance's deputies were deploying tasers, not completing "incident reports", and the taser data was not been reviewed by anyone leading Mr. Burwell to opine that

> The Tippah County Sheriff's Department failed to monitor, train, and supervise the deployments of the Tasers used by their department. ***There is an abnormal and unexplained usage recorded on the Taser Data Ports.***

Ex. D, p. 15.

Vance was *the* "internal affairs" at Tippah County. Tr. 60-63. If a person had a complaint against an officer, they would come in and report it to Vance. Vance would then investigate. There were no formal polices or procedures in place. *Id.* With regards to taser usage, Vance would review incident reports to see if things were done in accordance with policy and procedure. *Id.* Vance did not interview the citizen who was tasered, accepting the officer's report at face value. Ex. C, p. 95, 105-107. As noted earlier, however, Vance was not even aware of one particularly egregious incident regarding Eugene Pannell. As noted by the unexplained taser usage, there were obviously more taser incidents than were reported because Vance was

13

ignorant of how the taser downloads worked, so he did not review them to make sure his deputies were properly using the taser and completing the required incident reports. In the Plaintiff's case, Jeffrey Rogers did not complete an "incident report" until *after* the F.B.I. started investigating. Ex. B, p. 73. Yet, Jeff Rogers was not disciplined by Vance for failing to fill out an incident report. Ex. C, p. 70.

There were other "policies" which were never followed or enforced which shows a lack of supervision. When a taser is fired, confetti like paper called AFIDS (anti felon identification tags) are ejected from the taser. Each AFID "is printed with the serial number of the cartridge deployed, allowing departments to determine which officer deployed the cartridge and the location where the Taser was deployed from." See Ex. D, p. 18. Vance testified that the AFIDS are required to be picked up after each deployment but they were not in Hunsucker's case. Ex. C, p. 71. Vance testified that the AFID's were not collected simply because they were too difficult to retrieve. *Id.* However, not all thee AFID's need to be collected. One would suffice to demonstrate which taser was deployed.

Collecting the AFIDS is important because it shows which officer actually deployed probes as opposed to drive stunning. The Plaintiff maintains he was shot multiple times with the probes. Jeffrey Rogers denies shooting the Plaintiff with the taser and claims only to have used the taser in the drive stun mode twice. One cycle lasted for 17 seconds and the other cycle lasted for 5 seconds. Ex. B, p. 32, 36-37.[7] William Rogers claims to have only fired the probes once and then used the "drive stun" mode on the Plaintiff. William Rogers hit the Plaintiff with four 5 second cycles and one 6 second cycle. Had the AFIDS been collected, there would be no doubt as to how many times the tasers were actually deployed using the darts and which taser was used.

---

[7] Tippah County policy only permitted one 5 second cycle yet Jeffrey Rogers' 17 second deployment on the Plaintiff was condoned by the County. Ex. B., p. 33.

There are surely times when the use of tasers would be permitted in jails when an inmate disobeys or resists but not all resistive conduct justifies taser usage. In *Lewis v. Downey*, 581 F.3d 467, 477-478 (7th Cir. 2009) the Court noted that

> At the time he was shot, the Plaintiff asserts that he was merely lying on his bunk, weak and sluggish from more than ten days without food, when Shreffler ordered him to get up. Lewis claims that he said nothing and had time only to turn his head toward the doorway before Shreffler shot him with the taser. In Lewis's story, he was given a single order that was not repeated or accompanied by any warning that his failure to comply would result in use of the taser.

*See also Hickey v. Reeder,* 12 F.3d 754, 758-59 (8th Cir. 1993) (use of stun gun by jail officials against inmate to enforce an order to sweep his cell violated the inmate's right to be free from cruel and unusual punishment).

During the time the Plaintiff was tasered "the law [was] clearly established that officers cannot use intermediate force against an individual suspect who does not pose an immediate threat, even if the suspect is not fully complying with police commands." *Kaady v. City of Sandy,* 2008 WL 5111101, 19 (D.Or. 2008). "As of September 2005 ... police officers had reasonable notice that they may not use a Taser against an individual suspect who does not pose a threat and has merely failed to comply with commands." *Id.* at *21.*Cabral v. County of Glenn*, 624 F. Supp. 2d 1184, 1192 (E.D. Cal. 2009); *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) holding that "it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands[.]"

Vance was thus on notice that not every resistance by an inmate justified using a taser yet his policy permitted his officers to taser regardless of the level of resistance. Following Vance's policy, William Rogers and Jeffrey Rogers tasered the Plaintiff while he was in the isolation cell

15

and not a physical threat to anyone. Jeffrey Rogers testified that simply failing to comply with police commands while in the jail could be construed as "resisting" and justify taser usage. Ex. B, p. 24-25.

The fact that Tippah County had a policy regarding taser usage does not mean that it was actually followed. In fact, the testimony shows that the policy was ignored by Vance and his deputies. Vance lacked basic knowledge about the taser in order to institute a policy or ensure that it was followed. Vance repeatedly condoned taser policy violations and used the taser improperly himself. Summary judgment is not appropriate. A jury should determine whether Vance should be held individually liable for these actions.

### b. The "hole" was an unconstitutional condition of confinement

Since 1974 (if not earlier), detention officials in Mississippi have had the guidance of the following holding:

> [I]t is unassailable that the solitary confinement of naked persons in [Parchman's] dark hole, without any hygienic materials, any bedding, adequate food or heat, without opportunity for cleaning either themselves or the cell, and for longer than twenty-four hours continuously, *is constitutionally forbidden under the Eighth Amendment.*

*Gates v. Collier,* 501 F.2d 1291, 1305 (5th Cir. 1974) (emphasis supplied).

Apparently stuck in some type of time warp, Vance allowed Tippah County inmates to be shackled naked without running water, a toilet, or bedding and failed to institute any time limits, written policies, or procedures regarding the "hole". The Plaintiff's 8th amendment rights were clearly violated by Vance's unconstitutional policy.

Vance ordered the Plaintiff to be placed in the "hole". Ex. C, Tr. 25. The Plaintiff was placed in the Tippah County "hole" naked and then had his feet chained by the ankles through an

eye bolt which was several feet up on the wall. Ex. A, 83.[8] The chain was approximately 2 feet long. The only "bathroom" facility in the "hole" was a hole in the middle of the room. Ex. C, p. 20. The Plaintiff had already defecated on himself after repeated tasering and was not permitted to clean himself for two days. Ex. B, p. 48. There was no running water in the "hole". Ex. C, Tr. 21. The Plaintiff was left in the "hole" for almost 48 hours (Saturday at 6 p.m. to Monday around 10 a.m.).Ex. C, p. 35-36. Despite ordering him in the hole, Vance never bothered to check on the Plaintiff even after being advised by William Rogers that he had tasered and left the Plaintiff in the hole. Ex. C, Tr. 25, 40-41.

Vance's deposition is both inconsistent and vague regarding the policies surrounding the "hole". First, Vance admitted that there were no written policies or procedures regarding the "hole". Ex. C, p. 19. Vance later agreed that having written policies was advisable and it was clear that the jailers were not trained with regards to using the hole. Tr. 39-41. Although Vance claimed that the jailers were trained and certified regarding general jail procedures, no such information was ever produced in discovery or attached to the summary judgment motion. Vance could not say whether the jailers ever received any training regarding the use of isolations cells such as the "hole" but based upon Vance's other testimony it was clear that they were not trained. Vance himself never researched any law regarding the use of isolation cells nor was he aware of any constitutional limitations on the use of isolation cells including how long a person could be kept in a cell. Ex. C, p. 20. Perhaps if he did he would have found the *Gates* case, *supra*, which has been clearly established law for almost 40 years.

As far as time limitations regarding the "hole", Vance first said that there had been discussions "of maybe 24 hours or as long as necessary..." Ex. C, p. 22. When asked how a

---

[8] According to William Rogers, the eyebolt was approximately six inches above the raised concrete portion in the "hole" which served as the bed.

person who was left in the "hole" for 24 hours was supposed to use the restroom while their feet were shackled, Vance quickly retreated from his previous testimony and said that inmates "weren't shackled that long to my knowledge". Ex. C, p. 23. The key phrase "to my knowledge" is apparently an attempt to shield Vance from personal responsibility but he obviously knew about the 24 hour time period because he brought it up in his earlier testimony.

Vance claimed he only learned after the fact how long the Plaintiff was left in the "hole" and that he was shackled naked in his own feces. Ex. C, p. 35. While Vance agreed "this was a bit long" and improper use of the hole, he still did not discipline anyone. Ex. C, p. 35-36. Not only was the policy regarding the "hole" unconstitutional, Vance's refusal to discipline anyone simply condoned or ratified the use of the hole toward the Plaintiff and established that Vance's officers were acting in accordance with his policy:

> a supervisor's subsequent "ratification" of another's conduct can form the basis for liability under § 1983. *See Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991); *Logan v. City of Pullman Police Dept.,* 2006 WL 1148727, *2 (E.D.Wash.2006) (citing *Haugen v. Brosseau,* 351 F.3d 372, 393 (9th Cir.2003), *rev'd on other ground,* 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)). The decision to ratify specific conduct, however, must approve both the subordinate's decision and the basis for it, and the ratification decision must be "the product of a 'conscious, affirmative, choice' to ratify the conduct in question." *Haugen,* 351 F.3d at 393. It must be a decision to ratify unconstitutional conduct. *Logan,* 2006 WL 1148727, *4. Importantly, the circumstances of the ratification must also demonstrate that the supervisor had previously set in motion acts of others which caused the others to inflict a constitutional injury. *Larez,* 946 F.2d at 645–46.

*Peschel v. City of Missoula*, 686 F. Supp. 2d 1092, 1102 (D. Mont. 2009)

It was not until the Plaintiff's torture caught the attention of the F.B.I. that Vance decided to provide his jailers *some* guidance on the use of the "hole". Ex. C, p. 37-39. Unlike other civil cases, in cases brought under 42 U.S.C. §1983 post event incidents are admissible to demonstrate

18

a policy maker's acceptance of misconduct and for demonstrating what policies existed on the date of the alleged constitutional deprivation. In *Grandstaff v. City of Borger, Texas,* 767 F.2d 161 (5th Cir. 1985), the 5th Circuit wrote the following about subsequent conduct in § 1983 cases:

> [a]s subsequent conduct may prove discriminatory motive in a prior employment decision, [cite omitted], and subsequent acts may tend to prove the motive of a prior conspiracy, [cite omitted], so the subsequent acceptance of dangerous recklessness by the policymaker tends to prove his pre-existing disposition and policy.

*Id.* at 171.

*See also Beck v. City of Pittsburg,* 89 F.3d 966 (3d. Cir. 1996) (Excessive force complaint filed after the Plaintiff's incident "may have evidentiary value for a jury's consideration whether the City and policy makers had a pattern of tacitly approving the use of excessive force."); *Foley v. City of Lowell, Mass.,* 948 F.2d 10, 14 ("actions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident." Citing *Bordano v. McCleod,* 871 F.2d 1151 (1st Cir. 1989)).

Vance's attempt to distance himself from the how the Plaintiff was treated in the "hole" will not work. Vance allowed jailers and deputies to put inmates in the "hole" naked and shackled. He knew that there were no time limitations. He knew that there were no other policies or procedures with regards to the "hole". The inmates were shackled with a chain 2 feet long which was then attached to a mental ring several feet up on the wall. Since the chain was only 2 feet long, the inmates could not stand up. The only restroom facility was a hole in the middle of the room. The only way for these inmates to relieve themselves would be to do so while laying down meaning that they would be laying naked in their own feces and urine for an undetermined amount of time. It was patently obvious to any reasonable person that the Plaintiff's ordeal was a direct result of Vance's policy regarding the "hole".

19

Vance was not even clear on who had the ability to take a person out of the "hole" so it's no surprise the jailers were unclear as well. The Plaintiff was physically placed in the hole by William Rogers' after ordered to do so by Vance. However, according to police reports, the jailers on duty that night were not aware of how to handle the situation. Ex. C, p. 41. Vance even agreed to this and agreed that the jailers were in need of training and/or a clear policy with regards to the "hole". Ex. C, p. 41. The jailer on duty was not aware that he had the ability to remove Mr. Hunsucker from the "hole" once he calmed down[9]. Ex. C, p. 28-30. In fact, the jailer was advised to check with William Rogers before releasing the Plaintiff from the "hole". Ex. C. p. 28. Because Vance failed to have clear policies and procedures regarding the "hole" or provide his jailers with training regarding the "hole" the Plaintiff was left in the hole shackled to the wall for 24 hours and then left another full day after that. All the while, the Plaintiff was naked and soiled.

After the Plaintiff's ordeal, Vance allegedly sent out a written memorandum regarding the "hole". The new policy was never provided to the Plaintiff in discovery but Vance attempted to provide the details in his deposition:

> [the policy] established...the person being placed in the smock as they should be when they're nude after they're calmed down or they no longer pose a threat. Placed in the smock and any shackling or leg restraints need to be---I need to be notified or Roy, being the Chief deputy, need to be notified, maybe Sharon [Kubish]. I don't remember verbatim.

Ex. C, p. 39

The written policy, if it exists, still did not address the hygiene issue or establish a time limitation on how long someone could be kept in the "hole". Still, the fact that a written policy was created

---

[9] The Plaintiff does not concede that he was as unruly as claimed by the Defendants.

after the incident proves that there was no policy existing prior to the incident and that there was

a strong need for a policy.

The "hole", as used by Tippah County, is an unconstitutional condition of confinement.

Thus, the standard set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979) must be applied to determine

whether the "hole" is used in such a way as to violate the Eighth Amendment:

> In evaluating the constitutionality of conditions or restrictions of
> pre-trial detention that implicate only the protection against
> deprivation of liberty without due process of law, we think that the
> proper inquiry is whether those conditions amount to punishment
> of the detainee. (Footnote omitted). Essentially, the court must
> decide whether it is but an incident of some other legitimate
> governmental purpose.

Id. at 538.

[I]f a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or

purposeless – a court permissibly may infer that the purpose of the governmental action is

punishment that may not constitutionally be inflicted upon detainees qua detainees. *Id.*

The Court may also consider the "episodic act or omission" standard. In *Scott v. Moore*,

114 F.3d 51 (5th Cir. 1997), the Court addressed a case where a jailer sexually assaulted a female

pre-trial detainee. The Court, relying upon *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996)

and *Farmer v. Brennan*, 511 U.S. 825 (U.S. 1994) refused to apply the *Wolfish* "condition of

confinement test" and instead applied the "episodic act or omission" test. In an

> 'episodic act or omission' case, an actor usually is interposed
> between the detainee and the municipality, such that the detainee
> complains first of a particular act of, or omission by, the actor and
> then points derivatively to a policy, custom, or rule (or lack
> thereof) of the municipality that permitted or caused the act or
> omission.

*Scott* at 53.

As such, when analyzing the claim against Vance, the Court must use the *Bell* standard and/or

the "episodic act or omission" test. In condition of confinement cases, one can "assume by the

21

[county's] promulgation and maintenance of the complained of condition, that it intended to cause the alleged constitutional deprivation." *Flores v. County of Hardeman, Texas*, 124 F.3d 736, 738 (5th Cir. 1997).

Applying this standard, a jury question exists as to whether Vance is liable to the Plaintiff. Forty (40) years ago, *Gates* clearly established that using isolation cells the way Vance ordered was a violation of the Eighth Amendment. Vance ignored constitutional limitations on isolation cells refused to provide any training whatsoever to his jailers and deputies on the proper use of the hole.

The case *Madrid v. Gomez*, 889 F.Supp. 1146 (N.D. Cal. 1995), is persuasive authority that the "hole" was punishment. In *Madrid*, a class of prisoners brought suit alleging numerous Eighth Amendment violations. Two of these allegations related to conditions of confinement. One practice the prison used was to place prisoners in an outdoor cage during inclimate weather. The Court wrote that this practice was "callous and malicious [with] intent to inflict gratuitous humiliation and punishment." *Id.* at 1172. The other practice complained of was handcuffing prisoners in "fetal restraints". The prison records revealed "a practice of using fetal restrains at [the prison] for solely punitive rather than good faith security purposes." *Id.* at 1171. Should the Court decide to use the "episodic act or omission" standard, the result would be the same. The Plaintiff must show that Vance

> violated his clearly established constitutional rights and the
> violation resulted from a municipal policy or custom adopted or
> maintained with objective deliberate indifference.

*Scott v. Moore*, 114 F.3d 51, 54 (5th Cir. 1997), citing *Farmer v. Brennar*, 511 U.S. 825 (1994). "The constitutional deprivation suffered by plaintiff was not the result of the failure in a particular instance of an otherwise legitimate system for administering a county jail. *See Thompkins v. Belt*, 828 F.2d at 305. Rather, it occurred in compliance with what county

22

authorities unanimously characterized as the jail's standard operating procedure. *Doe v. Angelina County, Texas,* 733 F. Supp. 245, 258 (E.D. Tex. 1990). Mr. Burwell concluded that

> Sheriff Vance allows inmates to be kept in the"hole" for days naked and without medical attention. Listen to audio tapes. He knew of what was going on as well as the other employees. It was another custom and practice by the Sheriff which allowed his employees to treat inmates in a cruel and unusual way. Customs and practices become policy, even though they are not written.

Ex. D, p. 17.

The Plaintiff has clearly created a fact question as to whether Vance's policy regarding the use of the "hole" violated his clearly established constitutional rights. Additionally, Vance as the policymaker knew or should have known using the hole in this manner was improper and could lead to a violation of a person's constitutional rights.

Vance also condoned the treatment the Plaintiff endured in the hole by not disciplining anyone after the fact. A reasonable juror could conclude that such conduct was made with deliberate indifference to the Plaintiff's constitutional rights. Summary judgment is not proper in this matter.

## CONCLUSION

In City of *Canton v. Harris,* 489 U.S. 378 (1989) the Court wrote that

> It may happen in light of the duties assigned to specific officers or employees the need for more or different training *is so obvious,* and the *inadequacies so likely* to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the needs.

*Id.* at 390 (footnote omitted). See also *Rhyne v. Henderson Co.,* 973 F. 2d 386, 392 (5th Cir. 1992) quoting *Canton.* (emphasis added).

The Supreme Court went on to explain two specific situations in which a municipality may be held liable for failing to train its police officers:

> city policy makers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force. . . can be said to be 'so obvious', that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.

> It could also be that the police, in exercising their discretion, so often violate constitutional rights that they need for further training must have been so plainly obvious to the city policy makers, who, nevertheless, are 'deliberately indifferent' to the need.

*Id.* 390 n. 10.

Vance knew to a moral certainty that his deputies would be using the tasers in the jail and also using the "hole". Thus he was required to train them on the constitutional limitations on both the tasers and the "hole". This is so "obvious" that failing to do so constitutes deliberate indifference. Also, Vance knew or should have known that he and his officers were using the taser to violate the constitutional rights of citizens and need further training but ignored this need.

As a result of Vance's unconstitutional policies and procedures as discussed herein, the Plaintiff suffered multiple taser injuries and was left in the "hole" to suffer naked in his own waste for nearly 48 hours. Copies of pictures of the Plaintiff's injuries are attached as Composite Ex. I. Material questions of face exist which preclude summary judgment for Vance and the Court must deny the motion.

Respectfully submitted,

JIMMY DALE HUNSUCKER, JR.

BY:    */s/ Charles R. Mullins*
       CHARLES R. MULLINS

24

CHARLES R. MULLINS (MB# 9821)
COXWELL & ASSOCIATES, PLLC
Post Office Box 1337
Jackson, Mississippi 39215-1337
Telephone: (601) 948-1600
Facsimile: (601) 948-7097

25

CERTIFICATE OF SERVICE

I, Charles R. Mullins., attorney of record for the Plaintiff, do hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

R. Jeff Allen (Bar No. 10593)
HUNT ROSS & ALLEN
P.O. Box 1196
Clarksdale, MS 38614
rjallen@huntross.com

Christi R. McCoy
McCoy Law Firm
1739 University Avenue, No. 252
Oxford, MS 38655
mccoylaw@avsia.com

Laurie R. Williams
Charles G. Copeland
Copeland, Cook, Taylor and Bush, P.A.
600 Concourse, Suite 100
1076 Highland Colony Parkway
Post Office Box 6020
Ridgeland, Mississippi 39158
lwilliams@cctb.com
chartzog@cctb.com

This the 21st day of December, 2011.

/s/ Charles R. Mullins
CHARLES R. MULLINS

26