1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

JIMMY DALE HUNSUCKER, JR.                               PLAINTIFF

VS.                            CIVIL ACTION NO. 3:10CV008-M-A

TIPPAH COUNTY, MISSISSIPPI, et al                       DEFENDANTS

DEPOSITION OF WILLIAM ROGERS

Taken at the instance of the Plaintiff
on Monday, March 21, 2011,
in the offices of Christi R. McCoy, McCoy Law Firm
Oxford, Mississippi,
beginning at 12:50 p.m.

(Appearances noted herein.)

REPORTED BY:  Desi W. Arnold, CSR 1738

---

Arnold Court Reporting
1680 Thicket Cove
Belden, Mississippi 38826
(662) 296-6247
(866) 868-3604
darnoldcsr@yahoo.com

ORIGINAL

4

WILLIAM ROGERS,

having first been duly sworn, was examined and testified as follows:

EXAMINATION BY MR. MULLINS:

Q. State your name for the record, please?

A. William Rogers.

Q. All right. Mr. Rogers, you were present with me while I deposed your son, Jeffery, correct?

A. Correct.

Q. I'm going to go over just a couple things that I went over with Jeff. And if I call you Will --

A. That'll work.

Q. All right. Just so we can keep the record clear. Okay. No disrespect intended.

A. None taken.

Q. Thank you. Have you ever given a deposition before?

A. Yes.

Q. Okay. So you're familiar with the procedural, how it works?

MR. MULLINS: Let's go ahead and agree to the same situations.

MS. McCOY: Absolutely.

MR. MULLINS: And you want to read and sign your deposition. Okay. And all of the objections

30

1  A. Yes.
2  Q. All right. So, you know, I'm asking you here
3 today, based on your interaction with Mr. Hunsucker and
4 your use of the taser, were you following the training and
5 policies and procedures of Tippah County?
6  A. Yes.
7  Q. Okay. That's simple. You had already answered
8 it before so I was just making sure. I don't think it
9 violates your plea in any way.
10  A. All right. I've been there, and don't want to
11 go back there.
12  Q. No, sir. I can appreciate that.
13  A. More than enough for me.
14  Q. Okay. Now, did Tippah County do an
15 investigation into the use of the taser on Jimmy
16 Hunsucker?
17  A. It is my understanding that the sheriff did,
18 yes.
19  Q. Did he come talk to you?
20  A. We talked about it before the investigation and
21 then after the investigation, yes.
22  Q. Okay. And as a result of your use of the taser
23 on Mr. Hunsucker, did Tippah County or Sheriff Vance ever
24 impose any type of punishment on you?
25  A. No, sir, they did not.

41

1  A. That would be the same policy on anyone that's
2  in the jail or that we have -- or outside the jail.
3  Q. Do you, as a training officer, think that there
4  should be different standards on using the taser or any
5  use of force on folks who are mentally ill or on drugs?
6  A. To a certain extent, but you have to maintain
7  control at all times.
8  Q. Well, I guess what I'm saying, the person that's
9  mentally ill doesn't really have a lot of control over
10 their person.
11 A. Right.
12 Q. And, I mean, you agree with me -- or you may
13 not, but do you agree with me that if a jail is not
14 equipped to house a mentally ill person, that that
15 wouldn't be a good place for a mentally ill person to be?
16 A. I would personally think that, yeah, a jail is
17 not the right place for a person to be, but you also would
18 agree with me that an individual in the jail, in a
19 situation where they're out of their mind, can be just as
20 deadly and just as hurtful of you as any other person
21 that's in the jail.
22 Q. Well, let me ask you this though: She was in
23 the isolation cell away from everybody, right?
24 A. Right.
25 Q. So how could she --

42

1    A.   She was in a cell by herself.  She was not away
2  from everybody, no.
3    Q.   Well, how could she harm someone in the
4  isolation cell?
5    A.   No, she couldn't.
6    Q.   I'm going to show you -- I think this is your
7  use of force report that you filled out with Ms. Cox.
8         MR. MULLINS:  That's Tippah 275, I believe,
9    Jeff.
10   A.   Okay.
11 BY MR. MULLINS:
12   Q.   Can you identify that for me?
13   A.   Yes, sir.
14   Q.   Is that your use of force report?
15   A.   Yes, sir.
16   Q.   And I'm going to read this to you.  "She was
17 totally noncompliant."
18   A.   Yes.
19   Q.   "She tried to hang herself with her underwear.
20 She pushed a jailer and attempted to assault the jailer.
21 She was put into isolation and shown the taser multiple
22 times.  Her clothes were taken away.  She continued to
23 cuss and holler and disrupt the other prisoners."  Is that
24 your recollection?  Or is that actually your words there
25 that I just read?

43

1   A.   Yes, that's my words.
2   Q.   Okay.
3   A.   Some of that I was told what happened, and I put
4   that down in the report, yes.
5   Q.   Let me read this to you. "When arc was
6   displayed, subject stated she didn't care, to just shoot
7   her. She continued this even after the door was open.
8   After the taser was deployed, she became compliant. She
9   stated that she didn't want any more of that. Only one
10  probe hit her. The other probe hit the wall behind her."
11  Did I read that correctly?
12  A.   Right. And look at the picture. It will show
13  you that only one probe hit her.
14  Q.   What does that mean?
15  A.   One of the two probes is all that hit her. She
16  was not getting the full effect of the taser.
17  Q.   And have you ever been tasered?
18  A.   Oh, yeah, many times.
19  Q.   Have you ever had one probe in you?
20  A.   No. But I've had wires cross on top of me, and
21  it's the same effect. If the wires hit you --
22  Q.   Oh, sure.
23  A.   -- and it's going, you get zapped, too.
24  Q.   Okay. But with one probe in, is it still a
25  pain?

```
                                                                 45
1        A.    Okay.
2        Q.    This was Randy Barnes?
3        A.    Yes.
4        Q.    And this was on 5/21/2007?
5        A.    Yes.
6        Q.    And Mr. Barnes, you stopped him for a DUI,
7   possible domestic violence type situation.  Is that --
8        A.    Yes.
9        Q.    And I believe that when you stopped him he had
10  alcohol on his breath?  You gave him a PBT, portable
11  breath?
12       A.    Breath tester, yes.
13       Q.    And you handcuffed him and put him in the
14  backseat?
15       A.    Right.
16       Q.    According to your report, he became violent,
17  hitting the glass on the window?
18       A.    Had his feet on the windows -- on the glass on
19  the doors, yes.
20       Q.    And then you went and tasered him while he was
21  in the backseat?
22       A.    Yes.
23       Q.    And I believe that was the end of that?
24       A.    Yes.
25       Q.    Okay.  And, here, I'll give you the benefit of
```

```
                                                                46
 1    looking at your use of force report.  And your incident
 2    report is also there.
 3         A.   Yes.
 4         Q.   And see if that is accurate.
 5         A.   Okay.  My signature is there, yeah.
 6              MR. MULLINS:  Let's go ahead and get that
 7         marked as well.
 8              (Exhibit 3 marked for identification and
 9         attached hereto.)
10    BY MR. MULLINS:
11         Q.   Were you ever disciplined or reprimanded for
12    using the taser on Mr. Barnes while he was handcuffed?
13         A.   No.
14         Q.   His PBT registered .097?
15         A.   Yes.
16         Q.   That's in your report?
17         A.   Yes, I believe it is.  If you say it's there,
18    it's there.
19         Q.   I appreciate that.
20         A.   Because that was my signature or is a copy of my
21    signature.
22         Q.   And I believe this is one we didn't even cover.
23    Henry McNeely?
24         A.   Oh, yes, Mr. McNeely.
25         Q.   Now, this is not the same one --
```

78

1   Q.  Describe to me what you mean.
2   A.  I had him by the arm, and he was pulling a
3   little bit.
4   Q.  Okay. And he was still upset about him being
5   arrested?
6   A.  Oh, yeah. Oh, mouthy. Mouthy, mouthy.
7   Q.  Okay. But you still had not felt threatened
8   enough to handcuff him or anything like that?
9   A.  No. Absolutely not.
10  Q.  And you went up to the control room, they buzzed
11  you in?
12  A.  After I knocked on the door, yeah.
13  Q.  You went up to the hole with Mr. Hunsucker?
14  A.  Yes.
15  Q.  Tell me what happened.
16  A.  I was on Hunsucker's right-hand side. Jeff was
17  on his left-hand side. When we got to the door he reached
18  out -- Hunsucker reached out and grabbed the door and the
19  door frame.
20  Q.  Okay.
21  A.  And was holding on for dear life. Would not let
22  go. Jeff was trying to get him on -- his hand loose on
23  his side. I was trying to get the hand loose on my side.
24  His hands came free. I don't know why or how, whether we
25  forced it to or he just let go, but, anyway, we got him

83

```
1   normal man can spread his legs out about two feet.
2        Q.   How far is it away from the pipe that you thread
3   this in?  The rail or whatever it is you thread --
4        A.   The hook in the wall.  It's an eye bolt in the
5   wall.
6        Q.   An eye bolt.  How high is it off the ground?
7        A.   It's about that high.  (Indicating.)  What?  Six
8   inches.
9        Q.   Okay.
10       A.   Off the raised area -- above the raised area.
11       Q.   And how far is the eye bolt from the door?
12       A.   A foot-and-a-half.
13       Q.   Okay.  How far is the eye bolt from the toilet?
14       A.   There is no toilet.
15       Q.   Hole in the middle?
16       A.   Oh, the hole in the middle?  There's no way
17  that, at that point in time, that he could get to the hole
18  in the floor.
19       Q.   How was he supposed to use the restroom?
20       A.   Quieten down.  Become not so violent.  And then
21  the jailers would do what they're supposed do.
22       Q.   You do know that he was in there almost
23  24 hours?
24       A.   I heard that the next day, yes.
25       Q.   And you know he had calmed down the next
```