1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

JIMMY DALE HUNSUCKER, JR.               PLAINTIFF

VS.                    CIVIL ACTION NO. 3:10CV008-M-A

TIPPAH COUNTY, MISSISSIPPI, et al       DEFENDANTS

**DEPOSITION OF JEFFERY ROGERS**

Taken at the instance of the Plaintiff
on Monday, March 21, 2011,
in the offices of Christi R. McCoy, McCoy Law Firm
Oxford, Mississippi,
beginning at 8:42 a.m.

(Appearances noted herein.)

REPORTED BY: **Desi W. Arnold, CSR 1738**

------------------------------------------------------------

Arnold Court Reporting
1680 Thicket Cove
Belden, Mississippi 38826
(662) 296-6247
(866) 868-3604
darnoldcsr@yahoo.com

ORIGINAL

```
                                                              4
1                        JEFFERY ROGERS,
2         having first been duly sworn, was examined and
3         testified as follows:
4              MR. MULLINS:  All right.  Before we get
5         started, we've never had a deposition together,
6         and I usually do the, quote/unquote, usual
7         stipulations.  All objections are reserved except
8         for the form of the question.  And I'm assuming
9         that the witness wants to read and sign this
10        deposition?
11             MS. McCOY:  Yes, please.
12             MR. MULLINS:  Anything else before we start?
13             MR. ALLEN:  I don't think so.
14             MR. MULLINS:  All right.
15   EXAMINATION BY MR. MULLINS:
16        Q.   Could you tell me who you are?
17        A.   Jeff Rogers.
18        Q.   All right.  And, Mr. Rogers -- and I might call
19   you Jeff.
20        A.   That's fine.
21        Q.   And I don't mean any disrespect.  I hope that's
22   okay.
23        A.   That's fine.
24        Q.   You are here today as a defendant in the case
25   filed by Jimmy Hunsucker, Jr.  I'm going to be asking you
```

20

1  A. Written? I'm not positive about. I know we had
2  a use of form force that we had to fill out if we had used
3  the taser.
4  Q. Okay.
5  A. I remember that for sure.
6  Q. All right. I was looking at Exhibit 1. There
7  was a place to date and sign, and there is no signature
8  and date on that, correct?
9  A. Correct.
10 Q. So I was wanting to know when this policy went
11 into force.
12 A. That one I couldn't tell you. I don't remember
13 no dates.
14 Q. Okay. That's why I was wondering if your answer
15 to interrogatory No. 28 -- if there was some confusion
16 about whether there was a written policy at the time of
17 Mr. Hunsucker's tasing or whether it came afterwards.
18 A. To be honest with you, I can't remember.
19 Q. All right. Do you recall anything in the jail
20 itself regarding taser usage?
21 A. Yes.
22 Q. All right. Tell me about that.
23 A. There was a sign hanging up in the booking area
24 of the jail that said, "If you resist, you will be tased
25 with the" -- I don't remember exactly what the sign said.

21

1   There was a picture of the taser on the sign. I remember
2   that much about it.
3       Q.  Okay. And who put that up?
4       A.  James Page put those signs up. Well, Gary Welch
5   actually put them up.
6       Q.  Okay. Who is Gary Welch?
7       A.  He was an officer for Tippah County at one time,
8   and he was the training officer for the tasers at first.
9       Q.  And under whose administration did he work?
10      A.  He worked for -- the only two I know of for sure
11  are James and Brandon. Because before that I didn't have
12  anything to do with them, so I don't know.
13      Q.  When you came to work at Tippah County, was that
14  sign in the jail?
15      A.  Not at the time when I first started there, no.
16      Q.  So some time during your employment when Sheriff
17  Page was there is when that sign was erected?
18      A.  I believe it was.
19      Q.  Okay. And when Brandon Vance took over, the
20  sign remained?
21      A.  Yes.
22      Q.  What instruction did you, as a Tippah County
23  sheriff's deputy, get with regards to the policy regarding
24  that sign?
25      A.  Nobody ever really said anything about the sign

1  that I can remember.
2     Q.   And did anybody instruct you, your dad or either
3  Sheriff Vance or Sheriff Page, as to any limits as to when
4  a person who is in jail could be tased?
5     A.   I don't remember anybody saying anything.
6     Q.   Regarding somebody who is in a cell, such as
7  Mr. Hunsucker was in the isolation cell -- which I
8  understand y'all refer to as the hole, correct?
9     A.   Yes.
10    Q.   All right.  Was there ever any prohibition about
11 using the taser on someone who was in the hole?
12    A.   I never heard.
13    Q.   As a deputy at Tippah County, is it your
14 understanding that it was acceptable under policy and
15 procedure to use the taser on someone who was in the hole?
16    A.   Nobody ever said you couldn't, so I thought you
17 could, yes.
18    Q.   Had it happened before?
19    A.   Not to my knowledge.  I don't know.
20    Q.   All right.  Your dad, Will Rogers, was the
21 training officer?
22    A.   Yes.
23    Q.   A good sounding board for you to have as a
24 deputy at Tippah County would be the training officer,
25 correct?

23

1   A.   Yes.

2   Q.   Was your dad aware that, to your knowledge --

3   A.   I can't say anything that -- what he was or was
4   not aware of.

5   Q.   Did you all, you and your father, ever discuss
6   the policy -- and this is prior to Mr. Hunsucker's
7   incident.  Okay?  I'm not talking about what y'all
8   discussed afterwards.  Did you ever discuss the policy
9   about using tasers in the jail with your father?

10  A.   Never came up.

11  Q.   Did you receive any training using the taser
12  against someone who was already in jail?

13  A.   Never came up.

14  Q.   And I'm talking about with your training through
15  your dad or any refresher courses or anything.

16  A.   I don't remember the specifics of the test that
17  we took or any of that.

18  Q.   Now, as a seven-year deputy at Tippah County --
19  and I know you were volunteering part time, but you
20  understand the importance of training for law enforcement
21  officers, correct?

22  A.   Yes.

23  Q.   And you understand that if you're given a weapon
24  such as a gun or OC spray or, in this case, a taser, that
25  you should be trained on it?

1   A.   Yes.
2   Q.   And that the policies that you are working under
3   should be clear to you, correct?
4   A.   Yes.
5   Q.   Do you feel, as a deputy, that the policy
6   regarding the use of the taser in the jail -- the sign in
7   the Tippah County jail, was clear to the deputies?
8   A.   I can't say what anybody else thought. The
9   signs was up there. I thought it was okay to use them.
10  Q.   But you were never given any limits at all?
11  A.   Just as long as they were resisting.
12  Q.   And resisting, to you, would be what in that
13  situation?
14  A.   As long as they're actively trying to fight
15  back, or as long as they're actively trying to fight with
16  you.
17  Q.   How about failing to comply with orders?
18  A.   That can be resisting, yes.
19  Q.   Such as not taking off your clothes?
20  A.   If that was failure to comply, yes.
21  Q.   And I use that in the context. Mr. Hunsucker
22  was put in the hole --
23  A.   I understand where that comes from.
24  Q.   All right. And there was some indication --
25  part of the policy and procedure, when someone at Tippah

1  County, they had to be put in naked, correct?
2      A.  Put in their underwear.
3      Q.  And your understanding of the sign in the Tippah
4  County Sheriff's Department, if the inmate, specifically
5  Mr. Hunsucker, did not take their clothes off as required,
6  taser use would be appropriate; is that correct?
7      A.  It could have been, yes.
8      Q.  To your understanding, Sheriff Page or Sheriff
9  Vance, were they aware that the taser was being used in
10  the jail?
11      A.  To my understanding, I really don't know how to
12  answer that.  Because you're asking me to answer if they
13  were aware of something that I don't know if they were or
14  were not.
15      Q.  What I mean is, did there ever come a time
16  during your tenure at Tippah County where you had meetings
17  to discuss when it was appropriate to use a taser in the
18  jail cell and the sheriffs, either Page or Sheriff Vance,
19  were there at these meetings?
20      A.  We had meetings and classes, but, specifically,
21  on the taser use in the jail, I don't remember any
22  specific use --
23      Q.  Other than this incident with Mr. Hunsucker,
24  were you personally aware of any other inmates who were
25  tased in Tippah County jail?

1  A. I can't remember, to be honest with you. There
2  might have been. There might not have been. I don't
3  remember.
4  Q. Understand I don't want you to guess or
5  speculate.
6  A. Yes. I don't remember. So I can't really say
7  yes or no.
8  Q. But, you know, if you qualify an answer, say,
9  "I'm going to speculate or" -- that's fine. And I want
10 you to understand I'm not going to hold you to that, but
11 if you can speculate or guess or rumor or hearsay, that's
12 fine in this deposition. Okay? Understand?
13 A. Yeah.
14 Q. The taser usage that you and your father used on
15 Mr. Hunsucker, did you feel, based on your training and
16 experience and the policies and procedures in Tippah
17 County, that you and your father were acting
18 compliantly --
19 A. At the time, yes.
20 Q. -- with the Tippah County policy?
21 A. At the time, yes.
22 Q. You say "at the time." Has something changed?
23 A. No. I'm just saying, at the time, that's what
24 we thought was the best option.
25 Q. And as a matter of fact, did you personally ever

32

1  five seconds?
2      A.    I couldn't disagree with you because I don't
3  remember.
4      Q.    Okay. Do you know how long you used a cycle on
5  Mr. Hunsucker in this case, the one particular incident?
6      A.    I'm not positive, but I believe the taser said
7  it was -- it was over 10 seconds on one of them. I don't
8  remember the exact time.
9      Q.    Well, I'm going to show you the taser download
10 for the taser that you were using that evening. And it
11 says that it was 17 seconds on this. Does that sounds
12 right?
13     A.    I believe that's what I remember.
14     Q.    Let me go ahead and let you see this and see if
15 you recognize that.
16     A.    I don't read these downloads.
17     Q.    I think this was provided in your criminal
18 discovery, and I think Christi is showing you the date and
19 time, and it states the duration of 17 seconds; is that
20 correct?
21     A.    (Witness reviewing document.)
22     Q.    Is that correct?
23     A.    Yes, that's correct.
24     Q.    All right.
25     MR. MULLINS: Let's go ahead and get this

36

1  don't know.
2      A.  Yea.  I really don't know.
3      Q.  All right.  Now, according to the taser
4  download, on Exhibit 3 -- and I'm going to let you look at
5  this -- there was a taser usage at 5:33 for one second.
6  Let me let you look at that.  That's on page --
7      A.  I saw it.  It was the very first one.
8      Q.  Okay.  Are you sure about that?  Let me let you
9  look at it.
10     A.  I think it was.  That was the first one.  No,
11 there was another one earlier on that page.  That
12 weapon -- was having trouble with it, so we would pull the
13 cartridge off and check to make sure it was working.
14 That's the one-second.  And then you cut it off.
15     Q.  That's your sparking?
16     A.  Spark, yes.
17     Q.  Okay.  And so that's when you test the weapon?
18     A.  Yes.
19     Q.  So that wasn't one of the deployments?
20     A.  No.
21     Q.  Okay.  So disregarding that first usage, there
22 were three usage on Mr. Hunsucker on this weapon.  One was
23 for 17 seconds, correct?
24     A.  Correct.
25     Q.  The other was five?

37

1  A.  Correct.
2  Q.  And another --
3  A.  That's a different day.
4  Q.  Is that a different day?  Make sure you and I
5  are looking at the same thing.  This was five?
6  A.  Yeah.
7  Q.  Okay.  And this last one's a different day?
8  A.  That's what -- that's the date right there,
9  6/14.
10  Q.  Okay.  So you only had two usage on
11  Mr. Hunsucker?
12  A.  Yes.
13  Q.  A 17-second cycle and then a five-second cycle?
14  A.  Yes.
15  Q.  When we see this download, that's when the
16  prongs go in, correct?
17  A.  No.
18  Q.  Okay.  Tell me what this is showing me.
19  A.  No.  That was a drive stun.
20  Q.  Okay.
21  A.  The cartridge was taken off, and I took the
22  weapon and stuck it to him.
23  Q.  Okay.  Well, let me ask you this:  Did you ever
24  use it with prongs in Mr. Hunsucker?
25  A.  No.

47

1  We've covered that?
2      A.   Yes.
3      Q.   And according to your dad, Sheriff Vance told
4  your dad to take Mr. Hunsucker to the hole after the DUI
5  and booking progress was complete?
6      A.   Yes.
7      Q.   All right.  Tell me what happened after he
8  refused to take the intoxilyzer test.
9      A.   We escorted him back to the isolation cell, the
10 hole.
11     Q.   And when you say, "we," it was you and your dad?
12     A.   Yes.
13     Q.   And was Jimmy handcuffed at this time?
14     A.   No.
15     Q.   Now, during the encounter with you and Jimmy,
16 from start to end, you were -- and let me preface this by
17 saying I read over the prosecutor at the Justice Court,
18 his interview with the FBI, and according to his notes,
19 that he had talked with you.  And you had informed them
20 that you were not physically harmed during the altercation
21 with Jimmy Hunsucker; is that correct?
22     A.   Correct.
23     Q.   And that you were never in fear of imminent,
24 serious bodily injury; is that correct?
25     A.   Correct.

1  Q. When did you assist your dad in taking Hunsucker
2  back to the hole?
3  A. When he made it through the doorway out of the
4  booking area into the hallway.
5  Q. All right. And tell me what you did.
6  A. I walked beside Mr. Hunsucker until we got to
7  the door to the cell area, and then we started in towards
8  the cell, and he grabbed the door and then the wall, and
9  that's when I grabbed him trying to spin him around, get
10 him loose from the door where we could put him in there.
11 Q. All right. From the time Mr. Hunsucker left the
12 intoxilyzer room until he got to the hole, was he
13 compliant?
14 A. He wasn't. He was just cussing and raising
15 hell, being obnoxious.
16 Q. Okay. And I guess what I'm staying, he wasn't
17 fighting with y'all down the hall?
18 A. No.
19 Q. All right. He was still mouthing off, but he
20 wasn't resisting you in any way?
21 A. Nothing more than being obnoxious at the time.
22 Q. Okay. And when you get back, you have to go
23 through the control door, correct?
24 A. (Witness nodding head.)
25 Q. And the control door, you're buzzed in by the

73

1         attached hereto.)
2              MR. MULLINS:  And then the Pannell 302 we'll
3         make Exhibit 7.
4              (Exhibit 7 marked for identification and
5         attached hereto.)
6    BY MR. MULLINS:
7         Q.   While you were observing Mr. Hunsucker in the
8    intoxilyzer room, did you observe any officer beat,
9    strike, or taser him?
10        A.   No.
11        Q.   Have you spoken with -- other than your dad --
12   any of the other officers who were present, since this
13   incident?
14        A.   I'm sure I've spoken with them, but I don't
15   remember --
16        Q.   Did you talk about what happened?
17        A.   I can't remember talking with them about what
18   happened, no.
19        Q.   Your use of force report that you actually
20   filled out -- you did not fill that out immediately after,
21   did you?
22        A.   No, I didn't.
23        Q.   And at what time did you fill it out?
24        A.   It was after I spoke with the FBI investigator.
25        Q.   Why did you wait so long to fill out a use of