1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION


JIMMY DALE HUNSUCKER, JR.                    PLAINTIFF


VS.                           CIVIL ACTION NO. 3:10CV008-M-A


TIPPAH COUNTY, MISSISSIPPI, et al            DEFENDANTS



**DEPOSITION OF BRANDON VANCE**



Taken at the instance of the Plaintiff
on Tuesday, March 22, 2011,
in the offices of Christi R. McCoy, McCoy Law Firm
Oxford, Mississippi,
beginning at 9:17 a.m.



(Appearances noted herein.)



REPORTED BY: **Desi W. Arnold, CSR 1738**

---------------------------------------------------------

**Arnold Court Reporting**
1680 Thicket Cove
Belden, Mississippi 38826
(662) 296-6247
(866) 868-3604
darnoldcsr@yahoo.com

**ORIGINAL**

4

**BRANDON VANCE,**

1

2    having first been duly sworn, was examined and

3    testified as follows:

4  EXAMINATION BY MR. MULLINS:

5        Q.   Tell me your name for the record, please.

6        A.   Brandon Vance.

7        Q.   Mr. Vance, I'm Chuck Mullins.  You and I met for

8  the first time yesterday.  And you were present during the

9  depositions of both Will and Jeff Rogers, correct?

10       A.   Correct.

11       Q.   You've heard my preliminary statements to them

12  regarding depositions.

13            MR. MULLINS:  We're going to have usual

14       stipulations, Counselors, correct?

15            MR. ALLEN:  Yes.

16            MS. McCOY:  Yes.

17            MR. MULLINS:  Brandon is going to read and

18       sign.  All objections reserved except to form?

19            MR. ALLEN:  I'm going to ask him at the end

20       of his deposition if he wants the opportunity to

21       read and sign.

22  BY MR. MULLINS:

23       Q.   Again, obviously, you've got a cough today.  If

24  you need to take a break, you've got water in front of

25  you.  If you need --

19

1   insure whether it was in compliance with current law

2   enforcement standards as far as jail is concerned?

3       A.   I do not recall that.

4       Q.   Did you authorize Ms. Kubish to update the

5   manual in compliance, so it would be in compliance with

6   continuing law enforcement standards regarding jails?

7       A.   If she needed to.

8       Q.   You authorized her to do that?

9       A.   She could, yes.

10      Q.   Did you have a written policy regarding the

11  isolation cell, also known as the hole?

12      A.   Not to my knowledge, no, I didn't.  They were --

13  if I might, sir, they were -- jailers were certified, and

14  the procedures that were brought forward, that the people

15  had trained in, were modified according to the needs to

16  manage them under the training that the people received --

17  that the jailers received under the direction of the jail

18  administrator.

19      Q.   Okay.

20      A.   So there were procedures in place.

21      Q.   There was nothing written?

22      A.   Not to my knowledge.  There may have been memos.

23      Q.   Okay.  You say regarding the hole?

24      A.   Not to my knowledge on the hole.

25      Q.   Okay.  You say the jailers were trained.  What

20

1  training did they receive?

2      A.   State certification training.

3      Q.   And do you know if the state certification

4  training had any training dealing with the use of

5  isolation cells or the hole, such as the one at Tippah

6  County?

7      A.   I'm not familiar with the state certification

8  training.  Sharon could advise us on that.

9      Q.   Or did you research any laws regarding the use

10  of isolation cells, or the hole, such as the one at Tippah

11  County?

12      A.   I did not.  I relied on their training as to the

13  use of that and the procedures put in place.

14      Q.   Do you know of any constitutional limits on the

15  use of isolation cells such as the one at Tippah County on

16  inmates?

17      A.   I'm not aware of any.

18      Q.   Are you aware of the length of time a person

19  should be placed in an isolation cell such as the one at

20  Tippah County?

21      A.   I'm not aware of any.

22      Q.   Again, are you familiar with any limitations on

23  putting a person in the hole without use of a proper

24  bathroom?

25      A.   I'm not aware of any.  There was a center

21

1    portion where they could use the bathroom.

2        Q.   You say a center portion.  That was literally a

3    hole?

4        A.   A hole.

5        Q.   There was no running water?

6        A.   No running water.  The jail, of course, was

7    designed to meet the state criteria and the federal

8    criteria, whatever was required.

9        Q.   And when you say that they were designed to meet

10    the state criteria or federal criteria, the inspectors,

11    when they came to look at the jail, what were they told

12    were the uses of the hole?

13        A.   I don't know.  My jail administrator accompanied

14    them through the inspection process.

15        Q.   So you don't know what she informed them of, of

16    how long was the person kept in there normally and what

17    conditions, et cetera, et cetera?

18        A.   Repeat that, please.

19        Q.   Sure.  I'm assuming this is Ms. Kubish?

20        A.   Correct.

21        Q.   You're not aware of what Ms. Kubish informed

22    these inspectors, federal and state inspectors, concerning

23    the hole, how it was used, the duration a person was left

24    in the hole, or anything of that nature?

25        A.   I'm not aware of that.  We always passed

22

1   inspection without a problem.

2       Q.   Okay.  Did you receive any training regarding

3   jails, jail administration, inmate segregation, the use of

4   isolation cells, such as the hole?

5       A.   No.

6       Q.   Do you know if Ms. Kubish received that type of

7   training?

8       A.   I'm not aware of it.  She was certified as a

9   jailer and was sent to a national training.

10      Q.   Now, regarding the use of the hole, can you tell

11  me what the policy was regarding who would be placed in

12  the hole, how that was made?

13      A.   Somewhat, yes.  A combative subject, a person

14  who may pose a threat to other inmates or officers, or a

15  suicidal person.

16      Q.   And how long was the person, according to

17  policy, supposed to be kept in the hole?

18      A.   Typically, as long as needed.  I know there was

19  some discussion of maybe 24 hours or as long as necessary

20  to get that person -- if they were under the influence of

21  a drug or posed a threat or combative.  And they were seen

22  to during that time, of course, fed and given water and

23  necessary hygiene.

24      Q.   And what about the use of shackles on a suspect

25  while in the isolation cell?  What was the policy

1    regarding that?

2         A.    That was permissible to manage them so they

3    wouldn't be a threat to anyone who may open the door for

4    whatever reason.

5         Q.    And how were they supposed to be shackled?

6         A.    There was a ring attached to the wall that the

7    chain -- the leg restraints would go through.  And each

8    restraint or cuff would be placed on their leg around

9    their ankle.

10        Q.    And you heard Mr. Will Rogers' testimony

11   yesterday.  And he indicated the shackle chain was about

12   two feet long?

13        A.    Thereabouts.

14        Q.    Okay.  So the person was shackled by both

15   ankles?

16        A.    Correct.

17        Q.    And, according to Mr. Rogers' testimony, when a

18   person is shackled in this manner, he or she is unable to

19   use that restroom facility in the hole; is that correct?

20        A.    Correct.

21        Q.    If you have a person who is left in there this

22   24-hour period or longer while shackled, how are they

23   supposed to use the restroom?

24        A.    That would be a problem.  They weren't shackled

25   for that long, to my knowledge.  They would be let loose

25

1     Q.  Right.

2     A.  And we discussed that incident.

3     Q.  Okay.  So that's how this incident came to your

4  attention, correct?

5     A.  The incident of him being tased?

6     Q.  And shackled for this period of time?

7     A.  Yes.  Now, let me clarify.  The incident,

8  itself, I was made aware the night of the incident --

9     Q.  By whom?

10     A.  -- later, of course, than the incident.  Will.

11     Q.  He called you on the phone?

12     A.  Yes.

13     Q.  He told you about the tasing?

14     A.  Yes.

15     Q.  And also told you he had put him in the hole?

16     A.  Yes.

17     Q.  Of course, you had talked to Will prior to him

18  being placed in the hole?

19     A.  That's correct.

20     Q.  And it was my understanding it was your decision

21  to have Mr. Hunsucker placed in the hole?

22     A.  That's correct.  May I say something else?

23     Q.  Sure.

24     A.  You asked me early on about policies for the

25  deputies and use of force, firearms, that kind of thing.

28

1      Q.   Is that a proper use of the hole?

2      A.   To leave them there, no.  We have -- there was a

3 smock that could be placed on them as well as a mat when

4 they had to be placed in there for the reasons I mentioned

5 earlier.

6      Q.   And once a person is placed in the hole, as

7 Mr. Hunsucker was, whose decision is it to take a person

8 out of the hole?

9      A.   It could be made on the level of one of the

10 jailers if they called and asked -- if they were unsure

11 about the details of that, they could ask the jail

12 administrator or chief deputy on staff.

13      Q.   You're familiar, in this case, that the jailer

14 on duty actually checked with Will Rogers to see if he

15 could let Mr. Hunsucker out of the hole?

16      A.   That's correct.

17      Q.   And, again, there's no written policy, but is

18 that something that's within the unwritten policy

19 regarding the hole?

20      A.   That would be based on the jailers individual

21 call since Will had contact or was the arresting officer

22 in that case.

23      Q.   Well, I guess what I'm saying is, Mr. Rogers was

24 not at the jail.  After he placed Mr. Hunsucker in the

25 hole, he left the jail, correct?

29

1    A.    Correct.

2    Q.    So he was not there throughout the night,

3    correct?

4    A.    Correct.

5    Q.    He doesn't know how Jimmy Hunsucker was acting?

6    A.    Throughout the night, yes, sir.  No, not to my

7    knowledge.

8    Q.    The jailers would have the best --

9    A.    Unless they relayed it to him.

10   Q.    Well, the jailers would have the better vantage

11   point of being in the jail and going to check on the

12   inmates of who was doing what, correct?

13   A.    Right.

14   Q.    I mean, that's their job.  That's what they were

15   trained to do?

16   A.    Right.

17   Q.    So why would this jailer, who has been with

18   Mr. Hunsucker through the night and through the day, why

19   would they have to check with the arresting officer to

20   place Mr. Hunsucker in the cell to see if he could take

21   him out?

22   A.    I don't know that they would.

23   Q.    If a jailer was told that they had to check with

24   Mr. Rogers before they took Mr. Hunsucker out of the hole,

25   would that be proper or improper?

30

1      A.   It would be their decision who they checked

2   with.

3      Q.   But what if their decision was limited to, "Hey,

4   you can't take him out of the hole until you check with

5   Will Rogers"?

6      A.   What if their decision was limited to that?

7      Q.   Yes, sir.

8      A.   It wouldn't be limited to that.

9      Q.   Okay.

10     A.   You're asking me to --

11     Q.   I am.

12     A.   A hypothetical question here.

13     Q.   I am.  I am asking you would it be proper to

14  limit the jailers discretion to only let Jimmy Hunsucker

15  out of the hole if Will Rogers approved?

16     A.   No.  They could make their own decision about

17  that.

18     Q.   So it would be improper in that regard?

19          MR. ALLEN:  Object to the form of the

20      question.

21  BY MR. MULLINS:

22     Q.   You can answer.

23     A.   It could be, yes.

24     Q.   You say it could be.  In what way would it be

25  proper to say that it was up to Will Rogers whether Jimmy

35

1     Q.   And in that situation, he just actually had to

2  go where he was, correct?

3     A.   Correct.

4     Q.   And I say "go" -- to use the restroom?

5     A.   Sure.

6     Q.   And I want to phrase this in a nonlegal manner,

7  but is that proper in the jail setting, to have an inmate

8  confined in that manner?

9     A.   Not for that length of time.  He needs ability

10  to exercise hygiene.

11     Q.   After the leg shackles are taken off

12  Mr. Hunsucker Sunday evening, June 10th, he still was kept

13  in the hole, correct?

14     A.   I believe that's correct.

15     Q.   In fact, he was not released until Monday

16  morning, June the 11th, 2007?

17     A.   Correct.

18     Q.   At that time he made bond and was released?

19     A.   Correct.

20     Q.   And during the entire time that he was in the

21  hole, you were aware that he was not allowed to shower and

22  clean himself?

23     A.   After the fact, yes.  I was --

24     Q.   And I understand --

25     A.   I learned these things after -- all of these

36

1　things.

2　　　Q.　And he had, as we stated before, defecated on

3　himself from the taser, which happened Saturday night,

4　correct?

5　　　A.　Correct.

6　　　Q.　So he was in that condition for Saturday

7　afternoon until Monday morning, correct?

8　　　A.　Correct.

9　　　Q.　Now, again, is that proper policy and procedure

10　with regards to the jail at Tippah County?

11　　　A.　No.

12　　　Q.　And that's what you learned in your

13　investigation?

14　　　A.　Right.

15　　　Q.　Now, as a result of your investigation and

16　determining after the fact that these things occurred,

17　what did you do, if anything, regarding the punishment of

18　any employees?

19　　　A.　I didn't punish any of them.

20　　　Q.　And did you reprimand any employee in any way?

21　　　A.　I can't recall exactly what was said, but that

22　was not appropriate.　Relayed it to them that didn't need

23　to happen.

24　　　Q.　Did you do a written reprimand?

25　　　A.　I didn't.

37

1       Q.  Who did you reprimand?

2       A.  I don't recall.  I talked to all of them, and I

3 don't recall.

4       Q.  And just to make clear, you just did a written

5 statement to them saying, "Hey, don't do this any more"?

6       A.  I didn't write anything to them.

7       Q.  I'm sorry.  I said written.  I meant oral

8 statement, correct?

9       A.  Basically, yes.

10       Q.  Did you --

11       A.  I don't recall exactly what I said to them.

12       Q.  And you don't recall -- I'm sorry for

13 interrupting.  And you don't recall exactly who you said

14 it to?

15       A.  I don't.

16       Q.  Did you institute any written policies regarding

17 the hole after that fact?

18       A.  Yes.

19       THE WITNESS:  A memo.

20       MR. ALLEN:  I'm not sure what you're

21     referring to.

22 BY MR. MULLINS:

23       Q.  What are you talking about?

24       A.  Well, I told them that anybody -- and I'm doing

25 this from memory, now.

38

1    Q.   Sure.  You got a written memo that you sent to

2  the jailers after the fact?

3    A.   Yeah.  Yeah.  I believe I do.

4    Q.   Let me ask you this:  And I'm not saying Jeff

5  didn't produced this to me because we've got a lot of

6  paperwork, as you can see, but when you get back to the

7  office and put your hands on it, could you please give

8  that to Jeff so he can give it to me?

9    A.   Yeah.

10    Q.   Now, going by memory, and not going to hold you

11  to it, generally, what did the memo say?

12    A.   It established about the person being placed in

13  the smock as they should be when they're nude after

14  they're calmed down or they no longer pose a threat.

15  Placed in the smock and any shackling or leg restraints

16  need to be -- I need to be notified or Roy, being the

17  chief deputy, needed to be notified, and maybe Sharon.  I

18  don't remember verbatim.

19    Q.   Was there a time limit in the memo?

20    A.   I don't recall.

21    Q.   Was there anything related to hygiene in the

22  memo?

23    A.   I don't recall.

24    Q.   Now, let me ask you a question:  What is the

25  purpose --

39

1     A.   May I?

2     Q.   Sure.

3     A.   The person being managed in isolation, in the

4   hole, was under the supervision of the jailers, and they

5   made determinations either alone or among themselves or

6   through the jail administrator consultation as to how to

7   manage them.  And I let the administrator manage those

8   people.  And if there was a problem, they could come to

9   me.

10    Q.   Well, and I appreciate that, but you understand

11   that from doing this for four years as sheriff, that when

12   you don't have a written policy, you leave a lot of

13   discretion to jailers?

14    A.   I understand.

15    Q.   And some of the jailers are not the most

16   educated people in the world.  And I don't know your

17   jailers personally.  I'm making a generalization.  You

18   understand what I'm talking about?

19    A.   I do.

20    Q.   And when you don't have a written policy

21   advising these folks, you leave, sometimes, too much

22   discretion as to what to do and what not to do.  Do you

23   agree with me?

24    A.   I do.

25    Q.   And do you agree that having a written policy is

40

1    a better and more effective manner on dealing with

2    situations such as the use of an isolation cell?

3        A.   Correct.

4        Q.   There's no gray areas, and it's black and white

5    as to what to do and what not to do?

6        A.   Correct.

7        Q.   And that's exactly why you sent the memo out

8    after the fact, after the Jimmy Hunsucker incident,

9    correct?

10       A.   Right.

11       Q.   And -- yes, sir.

12       A.   I was not consulted during the time of his stay

13   there.  And neither was the chief deputy to my knowledge.

14       Q.   And, again, that is why you put in the memo,

15   "contact us," correct?

16       A.   Yes.

17       Q.   But in Mr. Hunsucker's case, you were the one

18   who authorized him to be placed in the isolation cell?

19       A.   Right.

20       Q.   And from Saturday until he was released, did you

21   ever come by the jail to check on Mr. Hunsucker?

22       A.   No, I was not in town.

23       Q.   Did you ever call anyone to check on

24   Mr. Hunsucker?

25       A.   No.

41

1      Q.   Did you ever make any efforts to check on

2  Mr. Hunsucker or see if he was released from the isolation

3  cell?

4      A.   No.

5      Q.   Now, getting back -- yes, sir.

6      A.   As other times in the past, other people that

7  were placed in there, left it to the jailers, jail

8  administrator, to make those determinations.  There were

9  procedures and routines that were normally carried out

10  when those persons had to be managed like that.

11      Q.   And you will agree with me that based upon what

12  we've seen with Mr. Hunsucker, some of the jailers that

13  were on duty that night were not aware of how to handle

14  the situation?

15      A.   Obviously not.

16      Q.   And they needed some type of training or policy

17  to direct them as to what to do when someone was placed in

18  the hole, you agree with that?

19      A.   Yes.

20      Q.   And that's obvious now to you, and that's why

21  you did the memorandum?

22      A.   That's correct.

23      Q.   I've got several versions -- and I say several,

24  I've got two versions of a taser policy.  I don't want to

25  confuse this.  All right.  So I'm going to try to do the

51

1    Q.   Download data?

2    A.   Download data.  Needed to be downloaded.

3    Q.   Yes, sir.

4    A.   And that's just a general idea of me getting it

5    done after we -- I mean, we should have had that done

6    beforehand.  I didn't think about it.

7    Q.   And why did you think it was necessary to put

8    that policy in place regarding the download data?

9    A.   I didn't realized you could do it until someone

10   told me.

11   Q.   Okay.

12   A.   If I knew about it before, I just didn't think

13   about it anymore.

14   Q.   Who told you?

15   A.   Maybe Will told me about it, that it could be

16   done.

17   Q.   Now, there was another policy regarding the

18   taser that we talked about yesterday, and it was a sign

19   that you placed in the jail itself?

20   A.   Uh-huh.

21   Q.   Yes?

22   A.   Yes, sir.  Sorry.

23   Q.   That's okay.  That's okay.  Can you tell me what

24   the sign said exactly?

25   A.   I don't think I can exactly remember it.

52

1    Q.   All right.

2    A.   If you resist -- if you're resisting, you will

3    be tased to stop resisting.

4    Q.   Did any other instruction regarding use of the

5    taser in the jail accompany that sign, or was it just that

6    sign?

7    A.   It was that sign based on the officers summary

8    of use of force continuum.

9    Q.   Well, let's look at Exhibit 5, which was in

10   place.  Was there anything in the policy which existed

11   when Mr. Hunsucker was brought in regarding the use of the

12   taser on someone who was in jail?

13   A.   No, it was the same policy that covered the use

14   of the taser.

15   Q.   So there was no written policy regarding the use

16   of the taser in the jail, correct?

17   A.   No, just policy right here.

18   Q.   And you agree with me that when a person is out

19   on the street in a car or out here on the square in

20   Oxford, it is a different situation than when that person

21   is incarcerated in a jail cell?

22   A.   The threat to an officer or another person is

23   the same.

24   Q.   You would agree with me that when a person is in

25   a jail cell, they do not have a weapon?

53

1    A.    That is correct except for their body and hands

2    and feet.

3        Q.    Exactly.   Whereas when they're out on the

4    street, they could have access to who knows what?

5        A.    That's correct.

6        Q.    And they are capable of fleeing the officer in a

7    car or on foot and escaping?

8        A.    Correct.

9        Q.    Whereas in a jail, the person is already

10   incarcerated.   He has several officers in the jail cell

11   and has also got several locked doors as well, correct?

12       A.    Correct.

13       Q.    And I guess the threat of escape is very

14   minimal?

15       A.    Correct.

16       Q.    And, again, a person could also be actually

17   locked behind the cell or in an isolation cell as well --

18   and I'm going with my comparison to someone on the street,

19   that this person in jail is already restrained behind a

20   cell?

21       A.    Correct.

22       Q.    Was there any guidance to either the jailers or

23   the deputies as to when a taser could be used on someone

24   who was in a cell or an isolation cell?

25       A.    It related to this policy, the taser use policy

54

1   based on the use of force continuum.

2          Q.   Did you finish your answer?

3          A.   Yes.

4          Q.   But, again, there was nothing specifically in

5   there regarding when or under what circumstances a deputy

6   could used a taser on someone who was in a cell or an

7   isolation cell?

8          A.   In the taser policy?

9          Q.   Yes, sir, in the taser policy?

10         A.   Just encompassed use of force related to the use

11  of force continuum.

12         Q.   Were there ever any discussions prior to

13  Mr. Hunsucker's arrest regarding the use of a taser in the

14  jail?

15         A.   No.

16         Q.   Any memos?

17         A.   No, none that I recall.

18         Q.   Do you agree with me that a sign on the wall, in

19  this case, regarding tasers, could allow a little too much

20  discretion for an officer to use a taser?

21         A.   Repeat that.  I heard you, but I'm --

22         Q.   Sure.  I understand.  A lot of times when people

23  actually ask someone to repeat a question, that's what

24  they're doing.  They're thinking of an answer.

25         A.   Uh-huh.

55

1      Q.   The sign on the wall that you had posted, do you

2  agree with me that that could leave a little too much

3  discretion to a deputy as to when and under what

4  circumstances to use a taser on someone in jail?

5      A.   The officer has been trained at what level to

6  use a taser, what level of force on the level of force

7  continuum to use the taser.  And that's what they're

8  trained to do with regard to the sign.

9      Q.   All right.  So the answer to my question then

10  would be it doesn't leave any discretion?

11      A.   I think the officer uses discretion based on the

12  summary of his training based upon the use of force

13  continuum.

14      Q.   We had talked about written policies before as

15  it relates to the hole.  Do you agree with me that you

16  think we should have policies --

17      A.   Correct.

18      Q.   -- to make it clear as to what the rules were

19  with regards to putting a person in the hole?  Do you

20  remember that?

21      A.   I do.

22      Q.   And you agree with me, I hope, that it should be

23  necessary to have written policies regarding when you can

24  use a taser on someone that's in jail already locked up?

25  You agree with me?

56

1     A.    The taser policy covers that.

2     Q.    And I don't want to get contrary with you, but

3  would you agree with me that there's nothing in that

4  policy regarding someone who is already incarcerated in

5  jail?

6     A.    There's nothing related to that in that taser

7  policy.

8     Q.    So it would allow a jailer or deputy to utilize

9  the same policy regardless of whether that person is out

10 on the street or in the jail?

11    A.    That's correct.

12    Q.    And you understand you and I talked about the

13 differences between someone who is out on the street being

14 confronted by a police officer and someone who is in jail

15 confronted by a police officer?

16    A.    That's correct.

17    Q.    And yet there were no policies when you were at

18 Tippah County regarding the use of tasers specifically on

19 someone who is incarcerated in jail, correct?

20    A.    That's correct.

21         MR. ALLEN:   Let me just object because you

22     keep asking that same question over and over, and

23     he keeps answering this policy applied to someone

24     in the jail.   I mean, for the record, it doesn't

25     state, "This is only for somebody on the street."

63

1    what was going to happen -- or what happened, and then

2    call in if anybody else needed to be called in, the MBI or

3    AG's office or something like that.

4        Q.   Would you investigate that in-house?

5        A.   A major complaint such as that?

6        Q.   Yes.

7        A.   No.

8        Q.   Well, in the situation --

9        A.   I wouldn't --

10       Q.   Go ahead.

11       A.   You know, something that significant that you

12   mentioned, I'd want someone else to look into it.

13       Q.   All right.  Now, in the situation with

14   Mr. Hunsucker, you did conduct an investigation, correct?

15       A.   Just an inquiry.

16       Q.   Okay.  Is that different from an investigation

17   in your mind?

18       A.   Well, I call it an inquiry.  I asked about it

19   and got statements from them so I'd know what happened.

20       Q.   And you have, as the policymaker, the choice

21   whether to discipline the officers or the jailers that

22   were involved, correct?

23       A.   Correct.

24       Q.   Right?

25       A.   Right.

64

1     Q. And at the end of your investigation, what, if

2 any, discipline did you impose on anybody with regards to

3 Mr. Hunsucker's tasering?

4     A. Nothing significant that I recall other than

5 just talking to them and finding out, as I mentioned

6 earlier.

7     Q. Did you condone the use of the taser on

8 Mr. Hunsucker?

9     A. At the level at which they were experiencing

10 assault, based on the taser policy, and the level of what

11 I knew -- I wasn't there --

12     Q. Yes, sir.

13     A. -- obviously. And I only learned about it after

14 the fact through the reports that I got. And based on his

15 level of resistance, that would be permissible. That

16 choice would be permissible.

17     Q. So you did condone the taser usage on

18 Mr. Hunsucker?

19     A. At that level of resistance, based on that --

20     Q. And you still feel that way today?

21     A. They made a choice.

22     Q. I understand. And you can explain as much as

23 you want. But just try to answer yes or no to my

24 questions first --

25         MR. ALLEN: He doesn't have to answer yes or

70

1    as they struggled with Hunsucker. She noticed that there

2    was a struggle occurring in the hole, but did not recall

3    ever seeing Hunsucker stand facing either deputy in an

4    aggressive posture." And I bracketed that on page three

5    going on to page four. I'll let you read that.

6         A.   (Witness complies.)

7         Q.   Did I read that correctly?

8         A.   You did.

9         Q.   All right. Do you know Natalie Bibb,

10   personally?

11        A.   I do.

12        Q.   Good employee of yours?

13        A.   Yes.

14        Q.   Any reason that you would know that she would

15   have to make up anything that wasn't true?

16        A.   No, not to my knowledge unless she didn't see

17   what was going on. She said she saw it, but --

18        Q.   Okay. All right. Now, in Hunsucker's case, we

19   know that Jeff Rogers did not complete a use of force

20   report timely in accordance with the policy, correct?

21        A.   Correct.

22        Q.   We also know that the AFIDs were not collected

23   by Will Rogers, correct?

24        A.   Correct.

25        Q.   According to Will, they were collected but not

71

1    logged into evidence?

2         A.    Right.

3         Q.    And that's a violation of the policies and

4    procedures, correct?

5         A.    According to the policy -- taser policy.  Right.

6         Q.    There were no photos taken of Mr. Hunsucker, his

7    injuries?

8         A.    Not to my knowledge, no.

9         Q.    But yet there was no discipline to either

10   officer for violating this policy in any way?

11        A.    At that time, the FBI came in, and I held off.

12   I held off on most everything as far as an in depth

13   investigation goes.  And those AFIDs that you're talking

14   about.

15        Q.    Yes, sir.

16        A.    Back there in the hole, they're difficult to

17   collect.  And if they didn't collect them, my main concern

18   was with respect to the policy, proper use of the device.

19   And this was a model policy here, and I probably should

20   have changed that because the AFIDs are difficult to

21   collect all of them.  But, yes, you asked was there a

22   violation.  Yes.  And did I discipline them for that?  No,

23   I didn't.

24        Q.    Thank you.  When you have any officer including

25   yourself --

73

1     drug or alcohol inducement. It's a condition, correct?

2        A.   I don't know. I'm not a psychiatrist or

3     psychologist.

4        Q.   Well, you know it's something that they can't

5     control? Do you agree with me?

6        A.   It could be. There's different levels of mental

7     illness, I'm sure.

8        Q.   And are you aware of different uses of force

9     with regards to law enforcement different uses of force

10     that are used for people who are mentally ill?

11        A.   I'm not aware of any.

12        Q.   Did you do any research on -- be it with Taser

13     International or other literature regarding tasers,

14     regarding the use of tasers on people who are mentally

15     ill?

16        A.   No, not that I recall, just if that person posed

17     a threat to himself, to an officer, or to others, the

18     taser could be used. Doesn't have a lasting effect on

19     them and allows the officer to take control of the

20     threatening subject.

21        Q.   Now, in the reports that I have -- and I'm going

22     to show you the ones that I have for you. And we're going

23     to get them marked individually. I've got three use of

24     force reports for you. One on a Seth Dore, D-O-R-E,

25     correct?

74

1    A.   Correct.

2    Q.   One -- well, actually it's two on a Robert

3  Duren, D-U-R-E-N.

4    A.   Right.

5    Q.   And they were both on the same day?

6    A.   Correct.

7    Q.   Apparently you had to tase him twice on the same

8  day?

9    A.   Right.

10   Q.   Separate instances?

11   A.   Correct.

12   Q.   And I'm going to show you what appears to be

13  your reports on those three cases, the use of force report

14  and the accompanying incident report and the downloads.

15  And they're stapled together.  Just look at that and make

16  sure the reports are yours.

17        (Off the record.)

18        MR. MULLINS:  Okay.  Let's go ahead and get

19     these marked.  I'm going to get Mr. Seth Dore

20     marked as Exhibit 8.

21        (Exhibit 8 marked for identification and

22     attached hereto.)

23  BY MR. MULLINS:

24   Q.   The first Duren incident, which happened at 1045

25  hours -- no wait, that's the second one.  The first one

1    was 1700 hours marked as Exhibit 9.

2         A.   Wait.  Are you sure?

3         Q.   No.  Okay.  1045 probably is --

4         A.   I think we had to -- the incident earlier and

5    then the 1745 was later.

6         Q.   Okay.  So the 1045 was 1045.  Yeah.

7              MR. MULLINS:  So this is Exhibit 9.  I'm

8         sorry.

9              (Exhibit 9 marked for identification and

10        attached hereto.)

11             MR. MULLINS:  And then that's going to be

12        Exhibit 10, and that's the 1700 one.

13             (Exhibit 10 marked for identification and

14        attached hereto.)

15   BY MR. MULLINS:

16        Q.   Okay.  All right.  I'm going to start with

17   Mr. Dore, D-O-R-E.  He was in the jail on chancery -- it

18   says charges, "chancery."  What is that?

19        A.   Chancery writ, mental subject lunacy, awaiting

20   for evaluation or something like that.

21        Q.   And that was his only charge?

22        A.   I don't recall if the deputies -- seems like

23   they got a call on him down at the children's home.  And

24   he ran off, and seemed like he was unstable maybe on a

25   substance or something like that.

76

1    Q.   Can you tell me where he was when you used the

2    taser on him?

3    A.   Isolation cell.

4    Q.   And was he chained up?

5    A.   The front.  No, there was an isolation cell in

6    the booking area.

7    Q.   Different one from the one Jimmy was in?

8    A.   It had all of the amenities that the other cells

9    had, that the isolation in the back did not have.

10   Q.   When you said amenities, that -- it had a

11   toilet?

12   A.   Yes.

13   Q.   Sink?

14   A.   Yes.

15   Q.   So he was in this isolation cell, and he was

16   acting up, for lack of a better word, in the isolation

17   cell?

18   A.   Well, he was -- I can't remember exactly what I

19   wrote right there.  May not be legible to you.  This guy

20   here was making a lot of noise.  I went back to see -- I

21   could hear him outside.  I came to work, and I could hear

22   him outside.  This is at 8:00 in the morning, thereabouts,

23   8:15.  I could hear him from the front as I was coming in.

24   I went back to see what was going on.  And he was in the

25   cell ranting and raving and stripping the blanket.  He

77

1   was -- had flooded the cell, urine. We had had someone in

2   the past try to hang themselves or hang themselves in that

3   cell.

4          And so I opened the door to try to communicate

5   with Seth to get him to quit because I didn't want him to

6   start trying to hang himself by stripping the sheets. And

7   he was -- didn't seem to be in control of himself. And so

8   I used hard empty hand control when I tried to talk to him

9   and calm him down, and he swatted at my arm -- swatted at

10  my hand.

11         And at that point I -- yeah, he struck my left

12  arm and then he tried to grab me and I struck him with

13  what's known as a brachial stun, a stun technique, to the

14  left side of his brachial plexus area. His knees buckled,

15  then he rushed me, and I struck him, knee to the

16  midsection, solar plexus, and he fell to his knees, and I

17  grabbed him and wrestled him to the floor.

18         And this wrestling went on for some time and the

19  urine and the water. And he had me around the collar and

20  kind of on the side, face down on the side -- had me

21  around the collar, and he wouldn't let go. I tried the

22  pleasure point techniques to no avail, and he was just --

23  he was trying to get up. And I was holding him down. And

24  I was getting tired. And I asked someone to get a taser,

25  something, I needed some help. I was getting tired.

78

1          (Off the record.)

2      A.    And as I recall, Roy, the chief deputy -- yeah,

3   it's his taser.  He came with a taser.  And I can't

4   remember if he fired that thing and missed or one probe

5   struck.  But I remember him about to fire that thing, and

6   I thought, oh, boy, you know, I'm going to get it, too.

7          And I just remember telling him to hand me the

8   taser.  And I showed it to the guy and I said,

9   "Son, let me go.  Let me go," something like that, "or I'm

10  going to shock you."  And he wouldn't let go, and so I

11  crackled the thing and stuck it there and then pulled it

12  off, just a couple seconds maybe.  And then, you know,

13  tried to get him to let me go again.  And I stuck it there

14  a couple seconds because it's a pain compliance, and my

15  other pain compliance techniques had not worked.  So

16  that's the gist of that.  That's what took place.  I was

17  trying to protect him from hurting himself.

18  BY MR. MULLINS:

19      Q.    Have you ever been tased before?

20      A.    No.

21      Q.    With regards to the situation you've just

22  described, you tased Mr. Dore twice?

23      A.    I drive stunned him.

24      Q.    Drive stunned.

25      A.    Touched him with the shocking portion.

79

1    Q.   Have you ever had any training on arresting and

2    handling mentally ill suspects?

3    A.   Just what I received at the academy, just

4    regular arresting techniques.  I have done that before --

5    Q.   I understand regular --

6    A.   -- from experience.

7    Q.   I understand regular arresting techniques, but

8    my specific question is:  Have you had training on

9    handling mentally ill suspects?

10   A.   Not specific training.

11   Q.   Okay.  Are you aware in reading -- well, let me

12   ask you a question here.  We have to keep up with our

13   legal reading, and we read Mississippi Bar magazines and

14   AVA and various other defense and plaintiff magazines on

15   cases that come down.  Did you ever subscribe to any

16   similar publications for law enforcement officers, such as

17   International Association of Chiefs?

18   A.   I don't recall.  Occasionally, we would get a

19   bulletin, an FBI bulletin or something like that that I

20   would look through.

21   Q.   And in your law enforcement career, are you

22   aware of different standards for arresting folks who are

23   mentally ill?

24   A.   Not that I recall.

25   Q.   Okay.

80

1        A.    Not that I know of.

2        Q.    Fair enough.  But just to be clear, Mr. Dore was

3   in an isolation cell, the one up front, when he was --

4   when you opened the door when this all began, correct?

5        A.    Right.

6        Q.    Now, I'm going to hand back Exhibit 8.  Looking

7   at the taser download that was done on this case, can you

8   show me Mr. Dore's -- underline it and bracket it.

9        A.    Hang on just a minute.  I don't reckon I see it

10  here.

11       Q.    Well, I didn't either.

12       A.    I don't know if it's the wrong paper or put the

13  wrong one with it or what.  Now, some of the other ones

14  were -- let's see here.  Some of the other ones were wrong

15  in the past.  I think y'all alluded to it yesterday.

16       Q.    Dates and times?

17       A.    Yeah.  I don't know if this is that case or not.

18  I don't know.  If I have some more downloads, maybe we can

19  put the two together.

20       Q.    Well, I just wanted to make sure because I did

21  not see a 5/29/2007.

22       A.    Yeah.  I don't see it right there.

23       Q.    All right.  And the taser that was used was Roy

24  Shapley?

25       A.    Yes, I believe so.  Yeah.

81

1   Q. Well, it has Mr. Shapley's name on it.

2   A. Right. That's --

3   Q. And let me ask you something. What I've asked

4 for is all of the use of force reports regarding the

5 taser. And I've gone over Will's with him, and I'm

6 getting ready to go over yours. Jeff said he had never

7 used it before. And I think they alluded to the fact that

8 there were possibly two others. Mr. Shapley's taser,

9 specifically, there are several dates where it appears to

10 me that the taser was used. Not a spark test but several

11 second durations. And I want you to look at it and just

12 scan through those different days.

13   A. I see that.

14   Q. Five second, ten second. There's several

15 entries, correct?

16   A. That's correct.

17   Q. Are you familiar with why the taser appears to

18 have been used?

19   A. No, I'm not, unless it was used in training

20 exercises. I don't know.

21   Q. You know, and I don't know. I'm just asking

22 you. Policy and procedure dictates that when it is used

23 on a person, that the use of force report is supposed to

24 be filed, correct?

25   A. Yes.

1      Q.   Are you aware of Mr. Shapley ever using the

2  taser on anyone?

3      A.   Yes.

4      Q.   Okay.  Who has he used the taser on?

5      A.   The only person I can recall is a fellow by the

6  name of Jarome Jehvan.

7      Q.   How do you spell Jehvan if you know?  J-A-V-O-N,

8  perhaps?

9      A.   J-E-H-V-A-N maybe.

10     Q.   And where did that tasering take place, if you

11  know?

12     A.   Out in an apartment area.

13     Q.   And was a use of force report completed?

14     A.   I don't know.

15     Q.   Was it during your tenure?

16     A.   Yes.  I think those things were sometimes put in

17  my box and sometimes Ms. Betty got them and filed them.

18     Q.   All right.  Exhibit 9 is the first Robert Blair

19  Duren taser.  And, again, it appears that he was in jail

20  on lunacy writ again?

21     A.   Right.

22     Q.   And he had been there since 8/10 of '07,

23  according to your handwritten notes?

24     A.   Uh-huh.

25     Q.   Correct?

83

1    A.    Yes.

2    Q.    And it was August 14th, 2007, I believe, when

3    this tasering happened?

4    A.    That's correct.

5    Q.    And you've looked through this and does it

6    accurately depict what occurred in relation to Mr. Duren

7    getting tasered?

8    A.    Yes, I've seen it before, and I did it.

9    Q.    Now, in the case of both Mr. Duren and Mr. Dore,

10   they were not aggressively resisting any officer prior to

11   you making contact with them, correct?

12   A.    At one point of contact?  What do you mean?

13   Q.    Opening the cell door?

14   A.    Were they -- no.  No.

15   Q.    They were just acting, as you've describing,

16   yelling, clogging up the toilets, et cetera?

17   A.    Right.  And with the potential of what I

18   perceived to harm himself in the form of --

19   Q.    Right.  But there were no officers in there or

20   no other inmates, so they weren't a threat to --

21   A.    Not -- no, not in that isolation cell.

22   Q.    Let me finish my question.

23   A.    I'm sorry.

24   Q.    They weren't a threat to any other inmate or any

25   officer prior to you opening the door and going in,

84

1    correct?

2         A.   Correct.

3         Q.   And I believe, in Duren's first taser, you used

4    Tommy Wilbank's taser; is that correct?

5         A.   Yes.  Let me see that.

6         Q.   Sure.  It says Tommy's on there.

7         A.   Yeah.  Make sure I got the right taser download

8    on my report.

9         Q.   Sure.

10        A.   On the other one, whose did I --

11        Q.   Roy.

12        A.   -- use?

13        Q.   On the other which one?

14        A.   On the second use on the Duren fellow.

15        Q.   Spares?

16        A.   Spare.  That was the one up front.

17        Q.   I'm assuming that's not Deputy Spare, that's

18   just an extra one?

19        A.   Right.  That's the one that the auxiliary or

20   part-time deputies would use.  It was on 8/14, 1045.  I

21   don't see -- well, I'm not seeing the -- all right.  I

22   think I've got the report attached to the wrong download.

23        Q.   All right.

24        A.   Or whoever attached this.

25        Q.   Well, I attached them, so let me make sure.

1     A.   All right.  Look on the back page and there's

2 two downloads for 8/14.

3     Q.   Yes, sir.

4     A.   One spark test and one actual deployment.

5     Q.   Okay.

6     A.   And on the front page of the report, it

7 indicates four cycles on the very front page of this

8 report, not the download, the actual taser use report.

9 The very front page.

10    Q.   Oh, here?

11    A.   The handwritten context on the first little

12 paragraph there.

13    Q.   Yes, sir.  Four cycles, yes.

14    A.   So I think the other download report will

15 probably -- well, it needs to be with that taser report

16 right there.

17    Q.   Okay.

18    A.   You follow me?

19    Q.   Yes.  There's another download report?

20    A.   Well, I mean, if there's one there.  I don't

21 know.

22    Q.   Well, fortunately, Jeff Bates stamped these and

23 did it in order for me.  And the whole report is Tippah

24 305 to Tippah 311.  So it wouldn't be difficult at all to

25 see if there's a Tippah 312 that I need to include.  And

1    it's not. That's the end of what we have. The others

2    were picked up with Will Rogers' taser usage. But the

3    last page on Exhibit 9 did indicate at least one taser

4    usage at 1702; is that correct?

5         A.   Yes.  Now, that's the -- there was one, yes, at

6    that time.

7         Q.   And it's 0119?

8         A.   Yeah.

9         Q.   Is that correct?

10        A.   I guess that's right.

11        Q.   All right.

12        A.   Now, that doesn't go with that report.  Are we

13   talking about the same one?  Is that the one you're

14   looking at that we were just talking about?

15        Q.   It doesn't, does it?

16        A.   No, that's what I was --

17        Q.   All right.  Hold on.

18        A.   I can clarified if you need me to.

19        Q.   Well, hold on just a second.  I understand

20   exactly what you're saying now because there were two --

21   okay.  Now, explain to me why it doesn't go with this one.

22        A.   I'm sorry.

23        Q.   Explain to me what you were going to say.

24        A.   Well, if you compare the two -- well, I'm sorry,

25   let me see -- can you just put it between us and let me

87

1    point out to you?

2         Q.   Sure.  Yes.

3         A.   Right here it says, after the fourth cycle, it

4    says, "Describe the demeanor after the devise was deployed

5    or used until after the fourth cycle."

6         Q.   Can I make a suggestion?

7         A.   Yeah.

8         Q.   If we swap --

9         A.   That's what I was wanting to do.

10        Q.   See, I'm going to hand you what we have as

11   another exhibit.

12             MR. MULLINS:  Let's go off the record.

13             (Off the record.)

14   BY MR. MULLINS:

15        Q.   Okay.  I think we got the exhibits correct.

16   Exhibit 9, is now correct.  It's got the proper taser

17   download with it, and so does Exhibit 10; is that correct?

18        A.   Yes.

19        Q.   Yes.  Okay.  Good.  Did you have your own taser?

20        A.   No.

21        Q.   Where is the spare one kept?

22        A.   It's kept in the file room next to the

23   secretary's office.

24        Q.   Do officers carry any type of personal taser

25   devices that aren't -- you're familiar with stun guns?

88

1    A.   Yes.

2    Q.   Do you know if any of your officers carry those

3    stun guns?

4    A.   Roy had one.

5    Q.   And just for the record, what is that?

6    A.   It's a shocking device, pain compliant.

7    Q.   It's different than a taser?

8    A.   It's different than a taser, no prongs come out.

9    Q.   It's just a handheld that you click and hold on

10   to the person?

11   A.   Right.

12   Q.   Are you aware of any other officers that had

13   those?

14   A.   No.

15   Q.   How about Will Rogers, specifically?

16   A.   I'm not aware.

17   Q.   It wasn't prohibited for an officer to carry

18   those?

19   A.   No, we didn't prohibit it.  Just didn't --

20   Q.   Did you -- I'm sorry.

21   A.   Just didn't have them except Roy that I'm aware

22   of.

23   Q.   Was he trained to use that device?

24   A.   No.  There was no training available for that.

25   Q.   And where did he keep his -- what do you call

89

1   that? What's the best description for it?

2       A. Stun gun.

3       Q. Is that good? That way we know I'm not talking

4   about a taser.

5       A. Yeah. Stun gun is what comes to mind.

6       Q. Where did he keep his stun gun?

7       A. In his desk. And I think he put it in his car

8   sometimes.

9       Q. So where was his desk located?

10       A. In the sheriff's office. His office was next to

11   mine.

12       Q. In relation to the intoxilyzer room, where was

13   it?

14       A. The jail is attached to the sheriff's office.

15   All right.

16       Q. Is your office in the same area as the jail?

17       A. It is, but it's separate from the jail.

18       Q. Okay.

19       A. The jail has a big iron door, secure.

20       Q. Sure. I got you.

21       A. Got the offices --

22       Q. All right. Did you have any policy with regards

23   to the use of the stun gun?

24       A. No.

25       Q. Were you aware that --

1      A.   I do know that Roy was small in stature and an

2  older fellow and smoked cigarettes, not in the best of

3  health.  And if someone got on him, he would use that, or

4  could use that, to get them off of him.

5      Q.   Had he used it on people before?

6      A.   One time that I'm aware of.

7      Q.   Did he have to fill out use of force reports

8  every time he used it?

9      A.   No.

10      Q.   All right.  He was in the cell both times when

11  he was tasered, correct?

12      A.   Correct.

13      Q.   An isolation cell?

14      A.   No.  Isolation cell one time and a holding cell

15  the next.

16      Q.   And you were moving him from one cell to the

17  other; is that correct?

18      A.   That's correct.

19      Q.   Prior to that time, he was not aggressively

20  resisting any officer or fighting with an inmate, correct?

21      A.   He was not, not to my knowledge.  I didn't

22  monitor him the whole time he was there.  We had to move

23  him for hygiene purposes.  He was -- had the whole jail

24  smelled up.

25      Q.   You know, crazy people will do stuff like that.

1    A.    Well, they can.

2    Q.    Maybe they don't need to be belonging in the

3 jail for four days.

4    A.    Well, that's a legislative matter, I suppose.

5    Q.    I agree.  I'm a big proponent against that.

6 That's neither here nor there.  Let's see if we can go

7 through.  Tell me, if the person is in the back --

8    A.    Are we through with Duren?

9    Q.    We are.

10    A.    Okay.  Well --

11    Q.    Did you want to add something to it?

12    A.    Well, yeah, he was a combative subject.

13    Q.    Okay.

14    A.    And I think the report reflects that.

15    Q.    Sure.  And he was also mentally ill?

16    A.    He was.  I'm not a doctor, again, a

17 psychologist.  I don't know that.

18    Q.    He was in there on a lunacy writ, correct?

19    A.    Yeah.  He needed to be evaluated, or had been

20 evaluated, and was being held until he could be placed in

21 a proper facility.

22    Q.    Sure.

23    A.    And he was aggressive towards me.  He grabbed my

24 arm, as the report reflects, and then lunged at me as we

25 were having to move him from one cell to the next.

92

1    Q.   Would you agree that training on handling

2  mentally ill suspects would be appropriate when you have

3  to deal with mentally ill suspects?

4    A.   Managing them in a jail environment or any other

5  environment would be the same for any other person is my

6  understanding.

7    Q.   You're not aware of any differences?

8    A.   I'm aware of, there may be differences in the

9  mental state, but they still pose the same threat.

10    Q.   Sure.  Well, and this is what I'm talking about,

11  Mr. Vance.  When you're dealing with someone who is

12  mentally ill, they may not respond to your verbal commands

13  because they are mentally ill?

14    A.   It's possible.

15    Q.   And they may not respond because they can't

16  appreciate the difference between right and wrong?

17    A.   It's possible.  At the same time, you have to

18  issue those same announcements to stop resisting or stay

19  down.

20    Q.   But, of course, there may be training out there

21  that you're not aware on how to deal with mentally ill

22  suspects in a different manner, correct?

23    A.   It could be.

24    Q.   You're just not familiar with them?

25    A.   I'm not familiar with them.

94

1    Q.   Okay.

2    A.   I never faced that where someone who had been,

3 if they had been, leveled a complaint regarding that.

4    Q.   Do what, now?

5    A.   No one's ever leveled a complaint regarding

6 that.

7    Q.   In this situation with Randy Barnes, you were

8 aware he was tasered?

9    A.   Yes.

10   Q.   And you were aware he was in the back of the car

11 handcuffed?

12   A.   Yes.

13   Q.   And I'll let you read this.  According to Will

14 Rogers, he went back and opened the door to try to get him

15 to calm down and showed him the taser?

16   A.   Yes.

17   Q.   I'm going to let you read this.  And according

18 to Will he would not calm down, and he started out of the

19 car.  And that's when he was tasered.  Do you recall that?

20   A.   I recall that.

21   Q.   And in this situation, what would be the

22 justification for tasering Mr. Barnes while he was

23 handcuffed in the back of the car?

24   A.   He was a violent suspect, according to the

25 report here.  He was trying to calm him down.  He was

95

1   still violent.  He started out of the car, which would

2   indicate a flee to -- in order to resist his arrest.

3        Q.   He was handcuffed, correct?

4        A.   Right.  They can still run.

5        Q.   How about closing the door?

6        A.   Well, I don't know if his feet -- I wasn't

7   there.

8        Q.   Did you ask?

9        A.   All I have to do is go by this right here.

10       Q.   Did you ask Will?

11       A.   I don't recall asking him.

12       Q.   You got this use of force report?

13       A.   Yes.  I saw it.  It's got my initials on it.

14       Q.   What did Mr. Barnes indicated had occurred

15   according to your investigation?

16       A.   All I'm going on is the report I have here.

17       Q.   You went to talk to Mr. Barnes about what

18   happened, didn't you?

19       A.   No, I don't recall having talked to him.

20       Q.   Well, how would you know his side of the story

21   without talking with him?

22       A.   I wouldn't unless he came forward with a

23   complaint.

24       Q.   Well, isn't the use of force report something

25   you investigated, whether it was done properly or not?

104

1    irons.

2         A.   (Witness examining document.)

3         Q.   And you see where Mr. Mathis indicated in the

4    summary of the case where he said he asked Mr. Rogers if

5    he could remove the leg irons, and then Rogers told him

6    they could remove them.

7         A.   If he wasn't causing any trouble?

8         Q.   Yes, sir.  You saw that?

9         A.   I saw that.

10             MR. MULLINS:  Let's go ahead and get that

11        marked as Exhibit 12.

12             (Exhibit 12 marked for identification and

13        attached hereto.)

14   BY MR. MULLINS:

15        Q.   Hopefully lastly, I want to talk to you real

16   quick about Angie Polly Cox.  Are you familiar with the

17   tasering that was done on Ms. Cox?

18        A.   I saw the report.

19        Q.   And Ms. Cox was in the isolation cell, correct,

20   according to the report?

21        A.   According to the report.  Let me review it if I

22   need to if you're going to go down there, go down that

23   path.  (Examining document.)  All right.

24        Q.   Okay.  And does that indicate that this lady,

25   Angie Cox, was in the isolation cell?

1    A.   Let me have another look.  I don't think I

2  looked at -- is there an accompanying report?

3    Q.   That's all we have on this one.

4    A.   Okay.

5    Q.   And Will's testimony, if you recall that from

6  yesterday -- and if you don't, you don't.

7    A.   Well, I remember him talking about it.  I

8  remember y'all talking about it.  It says, "She was

9  pushed" -- "she pushed the jailer and attempted to assault

10  the jailer.  She was put into isolation and shown the

11  taser multiple times."  I don't know if she was in the

12  isolation cell or put in the isolation cell.

13    Q.   Again, but this --

14    A.   It just seemed to me that she was in a cell --

15    Q.   And I'm not --

16    A.   -- then put into an isolation cell.

17    Q.   Based on Will's testimony, she was in an

18  isolation cell acting up.  He went to the isolation cell,

19  opened the door, she came, apparently, towards him, and

20  that's when he shot her in the stomach according to him?

21    A.   Is that what he said yesterday?

22    Q.   Pretty much, yes, sir.

23    A.   Okay.  I don't remember that.

24    Q.   Well, let me ask you this:  Did you ever

25  interview Ms. Cox as to what happened?

106

1     A.   I did not.  I know Polly.

2     Q.   How do you know Ms. Cox?

3     A.   Angie -- Polly has a long history of drug use,

4 cocaine use, alcohol abuse, and combative behavior.  She's

5 strong as some of the officers.

6     Q.   Does she have a history of mental illness as

7 well?

8     A.   I'm not aware of that.  She may have been

9 diagnosed with something, but I don't recall.  I don't

10 recall.  I think she has been sent somewhere to get

11 evaluated some time or another, and I don't recall where

12 or when.  Now, I believe that report indicates that she

13 was attempting to commit suicide.  Am I right?

14     Q.   Will's report?

15     A.   Taser report right there.

16     Q.   It says "suicidal."

17     A.   Well --

18     Q.   Go ahead.

19     A.   -- let's see here.  She tried to hang herself

20 with her underwear.  And she was totally noncompliant,

21 pushed the jailer, an attempted to assault the jailer.

22     Q.   Okay.  And you know Ms. Cox?

23     A.   I know of her, and I have seen her.  And

24 she's -- I've seen her in the jail.

25     Q.   And were you aware she was interviewed by the

1  FBI about this?

2       A.   I was not.

3       Q.   And that her version, as you can imagine, is

4  different than Will's version as he made in the report?

5       A.   May be.

6       Q.   And for your benefit, I will give you this

7  document and let you look at it so you can see what she

8  said.

9       A.   I have read what she says happened.  Whether

10  that's a truthful account or not, it would be suspected.

11       Q.   Okay.  Why would that be?

12       A.   Polly -- knowing her, I would believe would

13  fabricate some of that.

14       Q.   Not to -- but we heard Mr. Will Rogers yesterday

15  say he fabricated his police report, and admit to that.

16       A.   He did admit to it.  He pled to that.

17       Q.   But you never --

18       A.   I wouldn't -- he pled to that report right

19  there.  Not to all of the rest of his reports.

20       Q.   But that does call him under suspicion on his

21  other reports, wouldn't you agree?

22       A.   It could.

23            MR. MULLINS:  Let's go ahead and get

24       Ms. Cox's summary marked as whatever exhibit we're

25       on.  13?

1          (Exhibit 13 marked for identification and

2      attached hereto.)

3   BY MR. MULLINS:

4      Q.   But you didn't identify or discuss or talk with

5   anybody about Ms. Cox's tasering, correct?

6      A.   No.

7      Q.   Did you discuss it with Will?

8      A.   No.

9      Q.   None of the jailers?

10     A.   No.

11     Q.   And certainly not Ms. Cox, correct?

12     A.   I did not.

13     Q.   Did you ever look at the download of the taser

14  on Ms. Cox's tasering?

15     A.   I haven't seen that.

16     Q.   I haven't either.  Real quick, you mentioned a

17  couple lawsuits that you were involved in, in

18  interrogatory No. 12.  Do you recall those lawsuits?

19     A.   Yes.

20     Q.   What are those lawsuits?

21     A.   I think there's one from Carla Bell.

22     Q.   What does that involve, Mr. Vance?

23     A.   Do we have that report from Shawn or -- I wrote

24  a letter, and it was -- what do you call it?  What's the

25  word?

110

1  Timber Hills Mental Health, or were you another party that

2  wasn't included?

3           MR. ALLEN:  I think that was an et al.

4           MR. MULLINS:  I got you.

5  BY MR. MULLINS:

6      Q.   Were you sued as the sheriff of Tippah County?

7      A.   I was the sheriff then.

8      Q.   All right.  So she had made some type of --

9      A.   False allegations.

10     Q.   About --

11     A.   Against the way I handled her, and I never had

12  arrested her.

13     Q.   Okay.  Okay.  And then the other one is

14  Vuncannon versus United States of America.

15     A.   I can't remember his first name -- Vuncannon.

16     Q.   What is that one about?

17     A.   That was where he was injured when he was out as

18  a trustee doing some work.

19     Q.   Okay.  All right.  And this is something I

20  should have covered just a second ago.  And I promise I'm

21  about ready to let you go.  On Exhibits 9 and 10, which

22  were the Duren tasering --

23     A.   Uh-huh.

24     Q.   On the taser downloads -- and I'm going to flip

25  to both of them so we can look at it simultaneous.  We

1    know that at the bottom of the page of the taser download

2    is your tasering him.

3         A.    Right.

4         Q.    This is 8/14/2007.  But you can look in here

5    with me, and there's several others ranging from two

6    seconds -- I know the one-second ones are probably spark

7    tests, correct?

8         A.    I presume so, yes.

9         Q.    But there were several other cycles of five

10   seconds on 11/05/06; is that correct?

11        A.    That's correct.

12        Q.    And the next page there's other cycles of two

13   ranging to five on 11/19/06.  Again, on the next page,

14   there's several five and three-second cycles, four-second

15   on the next page.  Indicates that the taser was being

16   activated for several seconds, which is consistent with it

17   being used on somebody in some way, correct?

18        A.    Yes, could be.  Not sure that it was.

19        Q.    Not sure that it wasn't, correct?

20        A.    Correct.

21        Q.    And this was, I believe -- the one we looked at

22   just then on Exhibit 9 was the spare, which would have

23   been the one used primarily by reserve deputies, correct?

24        A.    Right.

25        Q.    But, again, if it was used on a person, it would

112

1    be required to have a use of force report?

2        A.    That's right.

3        Q.    And, again, and not to belabor this, but looking

4    on Exhibit 10 looking at the download data that we have on

5    this taser -- and this is Tommy's.  What's Tommy's last

6    name?

7        A.    Garrett.

8        Q.    Okay.  Again, we've identified the use that was

9    done that day on here somewhere.

10       A.    I think it was on the last page.

11       Q.    You're right.  The very last page, 0119.  But as

12   you look through Tommy's data, there's several five-second

13   usages on the first page, correct?

14       A.    Correct.

15       Q.    And on the next page, there's several two,

16   three, one eight-second use cycle and continuing on to the

17   third page, there's several four and three-second cycles.

18   Next to the last page, there's several -- numerous, one,

19   two, three, four, five, seven or so five-second cycles?

20       A.    Yes.

21       Q.    Again, it would be consistent with the fact that

22   the taser was being used for that period of time.  We

23   don't know if it was on a person or what?

24       A.    That's correct.  And I don't know if that was

25   during the training exercise or not either.  There was

113

1   some training exercises that took place.

2       Q.   Okay.  For recordkeeping sake, would it be

3   something that would -- so we wouldn't have this type of

4   confusion that you and I are having right now, that when

5   it's done for training purposes, that you would have some

6   type of form filled out to indicate, "Hey, we shot this

7   off on this date.  It was not" -- "we weren't shooting

8   Polly Cox or Randy Barnes, we were shooting" --

9       A.   Yeah.

10      Q.   And for training purposes?  Do you have

11  something --

12      A.   I think it would be consistent with the date of

13  the training that we could look back on these downloads

14  and see.

15      Q.   Could you do that for me so I can -- if it's

16  possible?  And I guess I'm requesting that that be done so

17  we can ascertain whether these downloads that we're

18  seeing, several seconds, up to ten seconds, were done on

19  training or they were unaccounted for.  Could you do that?

20           MR. MULLINS:  Jeff, I'm asking it be done.

21           MR. ALLEN:  Yeah.  If we've got access.

22      A.   If I've got that information.

23           MR. MULLINS:  Well, the county should because

24      I'm assuming -- and you represent the county.

25           MR. ALLEN:  I understand.  But there's been

114

1         an administration change and things --

2             MR. MULLINS:  Let me know.  If we have to go

3         and get the new sheriff in, we will bring him in

4         and see if he can provide that if that's what we

5         need to do.

6             MR. ALLEN:  We've been in contact with him.

7             MR. MULLINS:  Well, let me know.  And I mean

8         that.  Because I know Brandon's limited on what he

9         can get, and I appreciate what you've brought so

10        far.

11  BY MR. MULLINS:

12     Q.  Last thing.  And this will hopefully be quick.

13  John Jenkins.

14     A.  May I interject?

15     Q.  Sure.  Absolutely.

16     A.  Just occurred to me.  We have sought -- looked

17  for taser reports that have been filed --

18     Q.  Yes, sir, you have.

19     A.  -- that may be consistent with that use.

20     Q.  That's what I'm asking.  Tell me what -- and I

21  don't want to know any attorney/client privilege, but

22  you've been requested by your attorney to retrieve use of

23  force reports consistent with taser use, correct?

24     A.  Yes.

25     Q.  What have you done in that regard?

115

1     A.    What efforts have I made?

2     Q.    Yes, sir.

3     A.    I've contacted his sheriff and asked him to get

4     his staff to look.  Even my former secretary went with his

5     secretary and looked.

6     Q.    And the new sheriff is Karl Gaillard?

7     A.    Karl Gaillard.

8     Q.    And has he been helpful in this regard?

9     A.    Yes.

10    Q.    Okay.  So could you check with him on these

11    specific download datas that we have to see if he has use

12    of force reports consistent with that?

13    A.    I have asked for them, any of them.  Have not

14    gotten them.

15    Q.    So could you check with him on these?

16    A.    On these right here?

17    Q.    Yes.  The ones that we know the taser has been

18    used for several seconds on certain dates, to see if there

19    was training going on.

20    A.    Okay.  That was under my administration, and

21    he's not been able to provide any data with respect to use

22    of force reports relative to those dates and those times

23    of activation.  That's why I'm -- you know, I --

24    Q.    Well, you mentioned the training.  Could you

25    find out whether there was training going on on these

116

1    days?  Is there anything --

2         A.    Well, it may -- those right there -- those dates

3    are -- if I could refer to them again because the training

4    would have been largely on the same day or closely there

5    to.

6         Q.    Sure.

7         A.    And I'm saying --

8         Q.    Sure.  That's why I wanted you to --

9         A.    I'm saying that perhaps deployments, if they

10   were actually deployed in the line of duty, that the

11   reports that were filed, that are not accessible, would be

12   consistent with those downloads.

13        Q.    Right.  And it very well may be.  Several dates,

14   on October 14th and October 18th, but would there be

15   something to indicate whether training was going on?

16        A.    Maybe there was a day of training.  I can try to

17   find out.

18        Q.    That's what I'm requesting, to see if I can

19   figure out what's going on here.  John Jenkins came to see

20   you some time after this incident, correct?

21        A.    He did.

22        Q.    Are these your handwritten notes?

23        A.    It is.

24        Q.    You write about as bad as me.

25        A.    Thanks.