Ernest Burwell
Police Consulting
P.O. Box 2083
Thompson Falls, Montana 59873
406-531-9223
ewbk94@gmail.com

To: Attorney Charles R. Mullins
Post Office Box 1337
Jackson, Mississippi 39215-1337
Telephone: (601) 948-1600

Re: *JIMMY DALE HUNSUCKER, JR.* v *TIPPAH COUNTY, MISSISSIPPI*
*NO. 3:10CV008-M-A*

Date: January 28, 2011

Thank you for retaining me to review and render opinions regarding the June 9, 2007 police activity related to the arrest of Mr. Hunsucker. Pursuant to the requirements of Rule 26, I have studied the reports, training material, photographs, and other material provided to me regarding this case. Many of the requested documents have not been produced in this case. I have not been given Peace Officers Standards and Training documents for Tippah County Sheriff's Deputies.


### *My Qualifications for this case:*

I am familiar with and have personal knowledge and experience regarding the use of Tasers, their proper use by officers, and the proper training of officers regarding the use of Tasers. I have personal knowledge and experience, and have observed the practices and customs of law enforcement departments, regarding the employment and enforcement of proper training and use of Tasers by law enforcement personnel. My qualifications include the following:

I joined the Los Angeles County Sheriff's Department on January 21, 1977 and was a Deputy Sheriff for almost 30 years. For 20 years, I was assigned to the Special Enforcement Bureau ("SEB"), which included assisting S.W.A.T. calls. During this period of time, I taught both supervisory and lower ranking law enforcement personnel how to use the Taser weapon and how to download data therefrom. I was also in charge of managing the Tasers for the canine unit of SEB.

I have been tased and have deployed the Taser on individuals both during training and in the field. I have seen numerous Taser signature marks on people after the deployment of Tasers used in training and on suspects by other officers.

I hold a California Peace Officer Standards and Training ("POST") Advanced Certificate. Throughout my career with the Los Angeles County Sheriff's Department, I received ongoing POST certified training courses on police practices regarding interactions with individuals suspected of crimes and as being mentally ill. These training programs include learning domains, from which every officer in the State of California are taught, and many are taught throughout the United States. As a Deputy Sheriff, I frequently dealt with persons intoxicated, mentally ill, under the influence of controlled substances, hostile, barricaded, any and all types of misdemeanor and felony suspects.

I received my advanced Taser certification on June 26, 2001. As a Taser Instructor for several years, I was specifically authorized by Taser International, the manufacturer of the very same weapon used by the Defendants against the Plaintiff in this case, to teach law enforcement personnel regarding the use of the Taser. I own both the X26 and the M26 Tasers. I trained 46 deputies and six sergeants of the Special Enforcement Bureau of the Los Angeles County Sheriff's Department regarding the use of the Taser. I have written articles, lectured, designed, and developed systems to improve training procedures, customs, and practice of the Los Angeles Sheriff's Department regarding the practical use of canine units, whose officers were equipped with the Taser weapon. I continue my Taser training by reviewing each updated Taser DVD release by Taser International, which is obtained only through my expert witness documents requests. I have been an expert on over 50 Taser related incidents.

I worked the Los Angeles County Jail facilities which included minimum, maximum, and super maximum security. The jail population was in excess of 15000 inmates.

### Description of the Taser:

Electro-muscular disruption technology, as a tool used by peace officers to employ force, is unique from other weapons and techniques, and subject to specialized considerations concerning its proper use. Depending on its method of use, the Taser has the capacity to overcome the central nervous system, meaning that it can cause the human body to become rigid and inflexible due to the electricity running

through it. Two straightened fish hooks, approximately 1/4" long, penetrate the body to deliver the Taser Electro-Muscular Disruption Technology. However, when used in "drive-stun" or "contact tase" mode, the taser operates mainly as a pain compliance tool that does not incapacitate individuals in the same way as a taser used in "dart mode." Pulling and releasing the trigger on a Taser will initiate one 5 second cycle of approximately 50,000 volts at very low amps. There is no mechanism on the device prohibiting an officer from pulling and releasing it continuously, which would release continuous cycles of voltage into the subjects' body. In drive stun mode the Taser is much more painful and causes the skin to burn and become scarred. The person being Tased will react in a variety of different ways, and officers need to know what the person being Tased reactions will or could be. The reason is that this will help the officer to recognize that the suspect is not of his own control, and he is not resisting when the officer is giving the suspect commands and he won't comply. Properly trained officers will know that the person being Tased is not trying to kick or hit them on purpose, but is a reaction to being Tased due to the extreme amount of pain.

The Taser X26 records the date and time of each activation, the duration of the cycle, and the activation number. The Taser must have a maintenance program for departments using Tasers, to correct the time due to the clock drifting, identify and account for the Taser activations recorded, and properly supervise the Taser should numerous activations become unaccounted for.

It has become extremely common for officers to become Taser dependant and use the weapon far to soon and much to often. The officers using the weapon no longer go "hands on" but instead use the Taser weapon to Tase the suspect into total submission. By doing this, the use of force from the Taser has become excessive and unnecessary.

## Taser International promotes their product (M&X 26) to law enforcement claiming the following:

TASER ECDs include a highly advanced data download function that can help protect an officer from claims of excessive use-of-force by providing complete and accurate documentation of the time and date for each deployment. The dataport also provides law enforcement with a powerful management tool to track usage patterns and prevent misuse. Both the X26 and M26 ECDs have dataport functionality. The download kit comes with the necessary software and connector cable.

### *National Teaching of the Taser:*

Both Taser International and the International Association of Chiefs of Police ("IACP") teach that each department must set policies and procedures for the use of the Taser for their own department. Each department's policies and procedures should reflect Taser International's guidelines regarding the use of Tasers as a weapon. For example, officers should only apply the number of cycles reasonably necessary to allow them to safely approach and restrain the subject, especially when dealing with persons in a health crisis. Also, it is advisable to minimize the physical and psychological stress to the subject to the greatest degree possible. Furthermore, policies should underscore the need to avoid prolonged applications of the Taser where possible. Policies should reflect the officers' understanding that prolonged application of the taser will not physically permit a subject the opportunity to submit or surrender. In addition, policies should instruct officers to use alternate methods of controlling the suspect when it appears that the Taser is ineffective. Arrests should be affected via an arrest team, reflecting the principle that only one officer need apply the Taser - leaving the other(s) to subdue and detain the subject.

### *Department of Justice Investigation (Inglewood Ca.) regarding Conductive Energy Devices:*

*The IPD's Authorized Less Lethal Weapons and Ammunition policy, G.O. 1.1.5, includes the use of the M-26 / X-26 Advanced Taser. However, little direction is provided on how and when the Taser should be used. In accordance with best practices, the policy should specify that conductive energy devices ("ICED") should not be used against a subject in restraints. **We recommend that the IPD prohibit the use of CEDs on restrained subjects.** Moreover, when a subject is restrained and engages in active, violent resistance, the CED should be employed in rare circumstances, if at all. Indeed, a use of force policy matrix should adequately provide the officer with options and considerations other than the use of a CED. Moreover, the policy should require a high level of scrutiny in supervisory review whenever a CED is used on a restrained Subject.*

### *Amnesty International:*

### *Shocked while restrained:*

4

*Amnesty International acknowledges that some restrained individuals can still be violent and aggressive towards officers, and that police officers have the right to defend themselves. However, the organization remains concerned about reports of individuals who are subjected to taser shocks when they are already handcuffed or have been placed in other mechanical restraints. The use of the taser in conjunction with restraints has been a common factor in many of the deaths reviewed by Amnesty International (see above and appendix). Moreover, AI considers that inflicting excruciating pain on a suspect who is restrained, and not able to pose a serious threat to their own life or that of police officers or members of the public, constitutes an excessive use of force, sometimes amounting to torture or other cruel, inhuman or degrading treatment.*

## *The Braidwood Commission on ECW's:*

### *Canada's commitment to international treaties and conventions*

*During our public forums, Hilary Homes made a presentation on behalf of Amnesty International Canada, in which she suggested that police use of conducted energy weapons might violate Canada's international commitments. She stated:*
*Increasingly, the Taser appears to have been deployed simply too often and too soon. Amnesty International believes that using powerful electroshock weapons against those already restrained; disturbed, intoxicated, but non dangerous individuals; unruly children; and people who are non-compliant but who do not pose a probable threat of serious injury to themselves or others, is an excessive use of force which may in some circumstances also constitute torture or other cruel, inhuman or degrading treatment.*

## *Effects of the Taser on Suspects as Taught by Taser International:*

The effects of ECWs are well documented but vary somewhat depending on the subject and the circumstances. The following are typical examples of subject reactions to the electrical charge:

- Falling immediately to the ground
- "Freezing" in place (involuntary muscle contractions)
during the discharge of current, kicking.

5

- Yelling, screaming, or being silent
- Feeling dazed for several seconds or minutes
- Temporary tingling sensation
- Lack of any memory or sensation of pain
- <u>Signature marks that resemble surface burns on the skin that may appear as red marks or blisters</u>
- Eye injury from probe contact
- Secondary injuries caused by falling

## When To Use A Taser As Taught By Taser International, The Manufacturer of the M&X 26 Tasers:

### Taser Training Power Point Slide 117 The Decision to Deploy

*ONLY USE TO STOP A THREAT. The ADVANCED TASER should only be used to stop a threat. This would include threats to the officer's safety, threats to others, or even if the suspect is posing a threat of injuring himself. It should never be used for coercion of any type. The ADVANCED TASER gives you a non-injurious way of averting dangerous situations.*

*NEVER USE FOR PHYSICAL COERCIONS. The department should develop strong policies to deter misuse.*
*Warn suspect prior to Taser application when feasible in light of Deorie v Rutherford (9th Circuit, 2001).*
*Attempts to subdue the suspect with lesser force options have been in effective or will likely be ineffective in the situation.*

### Taser International Warnings:

Taser International Training Bulletin 12.0-04, June 28, 2005. The bulletin states that "repeated, prolonged, and/or continuous exposure(s) to the TASER electrical discharge may cause strong muscle contractions that may impair breathing and respiration, particularly when the probes are placed across the chest. Users should avoid prolonged, extended, uninterrupted discharges or multiple discharges whenever practicable in order to minimize the potential for over-exertion of the subject or potential impairment of full ability to breathe over a protracted time period."

6

# _The Taser is not to be used on the neck._

After 1989, officers throughout the United States were made aware of the Graham v Connor U.S. Supreme Court Ruling. The ruling made every officer in the country follow certain guidelines regarding the use of force. The officer's actions must be" objectively reasonable in light of the facts and circumstances confronting them, without regard to underlying intent of motivation."

As a police officer I was taught the following regarding the unreasonable use of force:

"**Unreasonable force** occurs when the type, degree and duration of force employed was not necessary nor appropriate. Malicious assaults and batteries committed by police officers constitute unlawful conduct. When the force used is unreasonable, the officers can face criminal and civil liability, and agency disciplinary action." (POST Learning Domain #20, Chapter 6.)

## What Police Officers are Taught Regarding "Taser and the Use of Force":

Michael Brave, a prominent police trainer and **national litigation counsel** for TASER International, summarized the lessons of the _Bryan v MacPherson_ as:

1. Taser devices are not risk free and officers need to take into consideration the risk of secondary injuries from incapacitation and falls in determining when and how to deploy a Taser device.

2. Taser devices, while non-lethal, are an intermediate or medium, though not insignificant use of force and every trigger pull must be justified as a separate use of force.

3. In any use of force analysis, an officer must consider the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

4. When circumstances allow, giving a Taser warning and an opportunity to

comply is very important prior to discharging a Taser device.

5. An officer must consider other less intrusive tactics that would have been available to effect the arrest and be able to articulate them in an arrest report.

6. An officer must ensure that commands are clear, are being heard and the suspect has the opportunity and ability to respond.

7. Understanding the difference between active and passive resistance and the different levels of use of force that can be applied in those different circumstances is very important for all officers no matter the use of force involved.

8. Officers need to understand what constitutional rights are clearly established in light of the specific context of the case in order to avail themselves of the protection of qualified immunity in excessive use of force claims.

9. This case highlights the importance that smart use training can play in teaching officers the proper use of a Taser device in accordance with judicial guidelines.


## Standardized Police Officer Training throughout the United States
## International Association of Directors of Law Enforcement Standards and Training:

The idea that those who perform the duties of law enforcement and criminal justice officers, should do so with professionalism and a sense of ethics, is not really new to western philosophical thinking. In fact, the origins of modern policing are commonly agreed to be found in the teachings of Sir Robert Peel over a century and a half ago. The formation of the International Association of Chiefs of Police in 1893 provided the first nationwide voice for reform and professionalization in policing. In this century, scholars generally agree that the most important early advocacy for professionalism can be found in the writing and actions of Chief August Vollmer, who promoted the notion that the Berkeley Police Department should be composed of competent, trained, and ethical officers.

At the close of the era of prohibition, President Herbert Hoover empowered the Wickersham Commission to look into problems in American policing. This Commission concluded that law enforcement was far too often found to be corrupt, brutal, and composed of unethical and untrained personnel. These shocking conclusions were never manifested in significant public actions, however.

- The next major report appears to have been published by the American Bar Association in 1953. In response to a recognition that policing in this country required improved professionalism, the ABA published a "Model Police Training Act." The Act outlined eight broad functions that should ideally be performed by police regulatory agencies.

In 1967 the President's Commission on Law Enforcement and the Administration of Justice published "The Challenge of Crime in a Free Society," and the follow-up task report, "The Police." Contained in both reports were recommendations pertaining to the American system of criminal justice. Major emphasis was focused on the police, and recommendations were offered to affect such areas as community policing, community relations, personnel practices and procedures, organization and operational policies and structures, and the recommendation that each state establish a Peace Officers Standards and Training (POST) Commission. At that time, 17 states had already established POST bodies. All states had them by 1981.

The National Advisory Commission on Criminal Justice Standards and Goals published its recommendations for improvements in 1973. Specific recommendations for upgrading the quality of police personnel ranged from proposals for improving recruitment and selection to encouraging the imposition of extensive recruit basic and in-service training requirements that would be made mandatory for all police personnel.

California and New York were the first to establish POST commissions in 1959. New Jersey and Oregon created POST commissions shortly thereafter in 1961. The last states to create POST commissions were Tennessee, West Virginia, and Hawaii. The staffs of POST organizations first formed an association in 1969 upon the urging of IACP. In 1987, the name of this association was changed from NASDLET TO IADLEST thereby reflecting a more inclusive Mission and Focus.

No analysis of the development of professionalism in the criminal justice

occupations would be complete without a reference to the positive impact of the Law Enforcement Assistance Administration's LEEP program. The Law Enforcement Education Program was the first significant infusion of federal funds designed to improve the education and management skills of police and criminal justice managers. A by-product of that great amount of funds was the establishment and creation of departments of criminal justice in practically every postsecondary institution in the nation. Thus was born the discipline of criminal justice and criminal justice studies that have done so much to advance the knowledge and practice of the criminal justice professions.

To be sure, the public horror and reaction to police brutality and unlawful tactics in response to the general public disobedience of the 1960's led to demands that the quality of police improve. Likewise, a string of important Supreme Court cases recognized that the power of police must be regulated and misuses punished. The extension of the exclusionary rule to the states through Mapp v. Ohio (1961) was only the first of the contemporary major decisions to recognize the need to proscribe police unlawfulness. Mapp was followed shortly thereafter by Escobedo v. Illinois (1964), Miranda v. Arizona (1966), Terry v. Ohio (1968), and Chimel v. California (1989) just to mention some of the more well-known cases. This has been paralleled by the rapid rise of civil liability recourse (42 USC 1983, 1987) against police misconduct. A police officer of the 50's would be confounded by what a professional officer of the 90's considers commonplace.

The POST organizations were created out of the crucible of conflict, change, and the demand for professionalism and ethics in public officers. POST programs exist to assure all citizens that peace officers meet minimum standards of competency and ethical behavior. POST organizations also have an obligation to the officers and agencies that they regulate, to adopt programs that are sensible, effective, and consistent with contemporary notions of what standards should be for all officers.

### Material studied for this case:

Taser Training DVD's
Version 1
Version 2
Version 3
Verison 4

Version 5
Version 6
Version 7
Version 8
Version 9
Version 10
Version 10.1
Version 11
Version 12
Version 13
Version 14
Version 14.2
Version 15
Version 17
Bonus Disk
Los Angeles Police Department Taser Training
International Association of Chiefs of Police Taser Model Policy
Numerous cases I have opined on where Taser was deployed.
Consulting with retired Los Angeles County Sheriff's Lieutenant Roger Clark
Consulting with active Los Angeles County Sheriff's Supervisors (to remain
anonymous due to retaliation) regarding hypothetical situations as this
incident.
Iacp Model Policy for ECW.
Braidwood Commission Report.
Ca. POST Training Domain # 1: - "History, Professionalism, and Ethics."
Ca. POST Training Domain # 2:- "Criminal Justice System."
Ca. POST Training Domain # 20: – "Use of Force."
Ca. POST Training Domain # 21: – "Patrol Techniques."
Ca. POST Training Domain # 33: – "Arrest Methods/Defensive Tactics."
International association of Chiefs of Police Taser Policy
Department of Justice investigation regarding Inglewood Ca. Use of Force.
Taser Litigation update by Taser Attorney Michael Brave.
Deposition of Richard Guilbault, Taser International.
U.S. Department of Justice, The Creation of National CED Policy
and Training Guideline.
IACP training keys regarding ECW.
Los Angeles County Sheriff's Department ECW Policy.
AELE Monthly Law Journal, Feb. 2010

11

Amnesty International.
ECW book written Jeffery Ho and Mark Kroll.
Numerous department policies regarding Taser and the use of force.
TNT, Truth not Tasers web site
Taser videos showing officer and suspect Taser deployments.
Photographs of Hunsucker's injuries
Defendants Pre-Discovery
Tippah County Sheriff's Department Taser Use of force Policy
Incident reports regarding the incident with Hunsucker
Jail logs
FBI investigation by SA Walter Glenn Henry regarding the use of force on Mr.
Hunsucker
Taser Dataport Downloads
Edwards and Pannell Taser incident
Use of force reports regarding this incident
Taser training videos depicting Taser burns to the skin of humans
Angle Drive Stun
Retained: 10-19-2010

## Overview of Events:

Mr. Hunsucker and John Jenkins were arrested and taken to the Tippah County
Jail. Mr. Hunsucker was escorted inside the jail and taken to a room where he
was held for approximately two minutes. Mr. Hunsucker was then lead to the
"breathalyser room" by Deputy William Rogers. Deputy Jeffery Rogers of the
Tippah County Sheriff's Department was present in this room. Mr. Hunsucker
was then told to blow into the breathalyser, but Mr. Hunsucker refused,
requesting a blood test. Mr. Hunsucker was refused a blood test.

Deputy William Rogers, Deputy Jeffery Rogers, Ripley Police Officer Ramone
Rengel, Ripley Police Officer Ken Walker and Ripley Police Officer Karl
Gaillard all became very upset when Mr. Hunsucker refused to blow into the
breathalyser machine at the sheriff's department. The Mr. Hunsucker was
pushed, choked and hit several times in his lower body by the deputies and the
officers present in the "breathalyser room". Mr. Hunsucker was "drive
stunned" with the taser in the throat area by Deputy William Rogers. Mr.
Hunsucker was handcuffed, with the cuffs in front of his body, while in the
"breathalyser room" and while he was Tased. Mr. Hunsucker was taken

12

outside of the "Breathalyser room" and handcuffed beside Jenkins, where he stayed for approximately two minutes, and then he was escorted to the "the hole". Sheriff Vance was made aware of the situation at the jail and he advised Deputy William Rogers to take Mr. Hunsucker to the isolation room. Mr. Hunsucker remained in the isolation room for approximately five minutes prior to Deputy William Rogers and Deputy Jeffery Rogers coming into the isolation cell.

Deputy William Rogers told Mr. Hunsucker to get on his knees and face the wall. Deputy William Rogers removed Mr. Hunsucker's handcuffs and directed him to put his hands on his head. Deputy William Rogers and Deputy Jeffery Rogers began Tasering Mr. Hunsucker all over his body. Deputy William Rogers used the Taser in "drive stun" on Mr Hunsucker while Deputy Jeffery Rogers fired the Taser in probe mode, into Mr. Hunsucker's body and repeatedly tasered him.

At one point, Deputy Jeffery Rogers jerked the prongs out of the Mr. Hunsucker's body, reloaded his Taser, fired the prongs into Mr. Hunsucker's body a second time and began tasering him repeatedly. During the attack by Deputy William Rogers and Deputy Jeffery Rogers, Mr. Hunsucker defecated. Mr. Hunsucker was made to remove all of his clothing by being coerced. The Taser was placed in his genitals. Deputy William Rogers handcuffed Mr. Hunsucker's ankles to the wall, "drive stunned" him with the Taser one more time, and left the room laughing.

Mr. Hunsucker remained in the isolation area for two days, unable to clean himself and without proper medical attention, prior to being released on Monday, June 11, 2007 at approximately 10:00 a.m.

Sheriff Brandon Vance was made aware that Deputy William Rogers left Mr. Hunsucker in the isolation cell in this condition. Upon release from jail, Mr. Hunsucker received medical treatment for the injuries he received while being incarcerated in the Tippah County Jail.

On 06-29-2007, Sheriff Brandon Vance removed Deputy Jeff Rogers from his work assignments due to statements made regarding the Hunsucker incident. It is my opinion the sheriff was trying to quiet this incident without the sheriff

initiating an internal administrative investigation regarding the use of Tasers on Mr. Hunsucker.

On 06-09-2007, Deputy William Rogers took possession of the tape recording of this incident. He obtained the tape from Officer Crenshaw. The tape recording was destroyed and the Taser Data Download information was corrupted. See statements by Crenshaw to FBI. The actions of Deputy William Rogers and Deputy Jeffery Rogers were reported to the Federal Bureau of Investigation which ultimately led to the prosecution of both of them in the United States District Court for the Northern District of Mississippi. <u>Deputy William Rogers and Deputy Jeffery Rogers both plead guilty to misdemeanor charges relating to their actions and were sentenced to jail terms, with Deputy William Rogers also receiving a fine and supervised release. They were ordered to surrender their POST Certifications and never be a police officer again.</u>

### Opinions:

- The facts all indicate Inmate Hunsucker was Tased numerous times on his body while in the care and custody of the Tippah County Jail Facility. The photographs indicate Mr. Hunsucker was Tased more times than reported on the Taser use of force report. See photographs of Mr. Hunsucker, Federal Bureau of Investigations reports, and medical charts of Mr. Hunsucker. The officers failed to be forth write regarding the facts of this incident by destroying evidence regarding this incident, and failed to write detailed police reports and depict the actual number of times Mr. Hunsucker was Tased on the Taser usage report and in the police reports. The fact is, the officers never wrote any use of force report as required by the Tippah County Sheriff's Department regarding this incident until they were questioned about it. Even though Sheriff Brandon Vance knew Mr. Hunsucker was in custody in the "hole", had conversations with the deputies the date of the incident, the Sheriff's Department allows such practices and customs to become policy.

- Tippah County, Mississippi Sheriff Brandon Vance failed to investigate this incident and other similar incidents regarding the use of Tasers on individuals. The pattern and practices of the lack of supervision has become policy, allowing the deputies to use the Taser without any

14

accountability. See download data for excessive usage and unaccounted activations. Sheriff Vance knew of the Taser incident with Randy Barnes but not Eugene Pannell. By looking at Taser usage by Sheriff Vance, the number one person in charge of this department, he failed to write a Taser use of force report for almost two months after the incident. Sheriff Vance, the policy maker and supervisor failed to follow his own policies. Sheriff Vance Tased Seth Dore on 05-29-07. He wrote the use of force report on 07-03-07. See Sheriff Vance's reports.

The Tippah County Sheriff's Department failed to monitor, train, and supervise the deployments of the Tasers used by their department. There is an abnormal and unexplained usage recorded on the Taser Data Ports. See Taser data downloads.

Inmate Hunsucker was Tased numerous times by Deputy William Rogers and Jeff Rogers while inmate Hunsucker was restrained in handcuffs and while shackled by both ankles to the wall inside a jail cell at the Tippah County Sheriff's Department Jail. This violated the department Taser use of force policy, but was condoned by the Sheriff's Department as evidenced by no internal investigation conducted into the events known by Sheriff Vance and others working at the time of this incident. Again, this has become a custom of this department to allow the use of the Taser on restrained and secured prisoners and prisoners who are in isolation cells.

Deputies W. Rogers and J. Rogers used excessive, unnecessary, and unreasonable force on inmate Hunsucker when they used the Taser on him while restrained. This force is considered Torture. The definition is:

- anguish of body or mind: agony
- something that causes agony or pain
- the infliction of intense pain (as from burning, crushing, or wounding) to punish, coerce, or afford sadistic pleasure.
- committed by a person acting in an official capacity.

Deputies W. Rogers and J. Rogers used excessive, unnecessary, and unreasonable force on inmate Hunsucker when they Tased his neck. See photographs of Mr. Hunsucker. Taser International States:

15

**Sensitive Body Part Hazard.** When possible, avoid intentionally targeting the ECD on sensitive areas of the body such as the *head, throat, chest/breast,* or known preexisting injury areas without legal justification. The preferred target areas are the lower center mass (below chest) for front shots and below the neck area for back shots.

Deputies W. Rogers and J. Rogers failed to notify a supervisor or write any use of force report until questioned about this incident. See date of incident vs date report was written.

The marks on Mr. Hunsucker's body were caused by placing the Taser against his skin. The only way to get the marks on Mr. Hunsucker like those pictured, is to activate the Taser. The heat from the Taser electrical output caused the burn marks, as trained by Taser International. See Taser International Training and photographs.

Inmate Hunsucker was never physically threatening towards any Deputy or custody officer, requiring the use the Taser on him. Inmate Hunsucker was behind bars and simply "running his mouth" as the deputies knew him to do by numerous prior contacts. My opinion is based on my experience as a 30 year veteran police officer, who has arrested thousands of persons under the influence of drugs and alcohol. I was also the jailer at Lynwood Station where numerous drunks and persons under the influence were brought in for booking.

There was no supervision on duty at the night of this incident. Even though Sheriff Vance, the number one person in charge of the sheriff's department, ordered Hunsucker to be placed in the "hole", failed to check on the welfare of Hunsucker. Because this is a very small department, the sheriff has knowledge of what occurs within his department. Sheriff Vance knew Hunsucker by first name and Hunsucker's mouthy practices.

There is a pattern and practice of excessive and unnecessary force established by Deputies W. Rogers and J. Rogers, where they Tase non threatening individuals. See statements by Randy Barnes and Mr. Pannell, who were also Tased by the same deputies. According to the FBI, the above persons were Tased and at no time were they ever a threat to Deputy Rogers and they never tried to escape.

16

17

The Sheriff's Department has created a custom and practice of excessive and unreasonable force by the use of the Taser, by placing placards in the jail for persons arrested to see. The placards state if you are uncooperative you will be Tased. With these kinds of ethics displayed by the department, it allows officers to freely use force without worry to any consequence to excessive force of Taser usage.

Sheriff Vance allows inmates to be kept in the "hole" for days naked and without medical attention. Listen to audio tapes. He knew of what he was going on as well as the other employees. It was another custom and practice by the Sheriff which allowed his employees to treat inmates in a cruel and unusual way. Customs and practices become policy, even though they are not written. See Interrogatory #28.

INTERROGATORY NO. 28:
Identify each Tippah County Policy or procedure that authorized the use of each method of physical contact as described in your answer to Interrogatory No.29 and describe each document that evidences or relates to each such policy or procedure.

*ANSWER: The policies and procedures involving the laser and its use were verbal.*

- The Taser is a use of force tool used by officers to stop a threat. The Taser is placed on the force continuum, the same as O.C. spray, the baton, a police canine, the Arwen/Sage, the bean bag projectile, and closed fists. It would then be unreasonable to use any of the above mentioned tools on a person in custody and restrained who is not assaultive.

- Mr. Hunsucker was improperly handcuffed.

- Mr. Hunsucker was Tased so long he defecated himself. Mr. Hunsucker was left shackled and naked for an excessive amount of time with fecal matter on him. See reports by the FBI regarding their documentation where other employees heard and observed Mr. Hunsucker to have soiled himself and the jail logs indicate he was not given a shower.

- Ripley Police Department Officers Ramone Rengel, Ken Walker and Karl Gaillard failed to intervene and stop the excessive force Deputies W. Rogers and J. Rogers was using on Mr. Hunsucker.



- The Tasers used on Mr. Hunsucker should have been sent to Taser International where Taser International could have downloaded the Tasers and corrected the time properly, showing the actual dates and times the Tasers were activated.

- The Sheriff's Department allowed the Defendants in this incident to have full access to all evidence such as the video and the Taser download data.

- Mr. Hunsucker has at least 10 sets of Taser burns to body. Left side of stomach near navel, just above navel, front of neck and right clavicle ,left side of neck' inside lower left leg, back of neck near base of skull.

81

61

- None of the AFIDS (as pictured above) were collected as evidence that showed where the Taser was fired from, and which cartridge the AFIDS came from. As a Taser instructor, that is a very important procedure taught by Taser International. Every time a TASER Cartridge is deployed, at least 24 small confetti-like Anti-Felon Identification (AFID) tags are ejected.

- Each AFID is printed with the serial number of the cartridge deployed, allowing departments to determine which officer deployed the cartridge and the location where the Taser was deployed from.

**Photographs of Taser Injuries:**

I have included photographs of Taser burn inmates and photos Taser International uses for training to teach instructors what Taser burns look like.

Due to the extreme number of Taser applications given to Mr. Hunsucker, look at the additional photographs of Mr. Hunsucker's Taser burns.

20







# Taser Training Showing The Results from Drive Stun

below photographs were placed in Taser Training Material Command Demo
Version 13, power point slide #28.



The above photograph was taken of an inmate Tased in The Dalles Oregon jail. The photo depicts Taser burn marks similar to those taught by Taser International as to the signature marks left from an activation in drive stun. This is extremely painful. Compare this photo to the Taser training photo and Mr. Hunsucker, there is no doubt Mr. Hunsucker was Tased numerous times.

22



23

The two photographs listed above were taken of an inmate who was Tased in a restraint chair at the Muskingum County Jail in Ohio.

As a Taser instructor and having Tased several people in the field, I have experience at seeing what a Taser burn looks like. I am not offering any medical opinions regarding burns. I am stating I know what Taser burn marks looks like due to my experience and training.



Below is the Los Angeles County Sheriff's Department Taser Policy. This department is the largest and most recognized sheriff's department in the United States. This is the same department I was a Taser Instructor for, trained by Taser International.

# Los Angeles County Sheriff's Department Taser Policy

## 5-09/175.05 ELECTRONIC IMMOBILIZATION DEVICE (TASER) PROCEDURES

The Taser is a less lethal hand held electronic immobilization device used for controlling assaultive/high risk persons. The purpose of this device is to facilitate a safe and effective response and minimize injury to suspects and deputies.

## Use of the Electronic Immobilization Device

The following policy guidelines shall be adhered to at all times:

Only Departmentally approved Tasers shall be utilized by personnel,

Tasers shall be issued to and used only by those who have completed the Department's Taser Training Program,

Prior to the use of the Taser, whenever practical, Department personnel shall request a supervisor,

Any individual subjected to an application of the Taser, in either the "probe" or the "touch/drive stun" mode, shall be taken to a medical facility prior to booking, for appropriate medical treatment and/or removal of the probes,

The Taser shall not be applied to gain compliance over persons whom personnel reasonably believe are not presenting an immediate, credible threat to the safety of Department personnel or the public,

Application of the Taser shall be discontinued once the suspect is controlled,

Personnel may demonstrate a "sparking" of the weapon in an effort to gain voluntary compliance of the suspect. In the event of such a demonstration, personnel shall include a notation in their Mobile Digital Log (MDT) fully explaining the necessity of their actions. In the event the Taser is "sparked" by personnel who do not complete an MDT log, personnel utilizing the Taser in this manner shall submit a memorandum to their direct supervisor fully justifying their actions,

24

Except in emergent circumstances, the Taser shall not be applied to the following without notification of the Field Sergeant of the intention to use the Taser, and the approval of the Watch Commander:

Civil demonstrators,
Handcuffed persons,
Persons detained in a police vehicle,

**Persons detained in any custodial setting.**
Persons in control of a motor vehicle,
Persons in danger of falling or becoming entangled in machinery or heavy equipment which could result in death or serious bodily injury,
Persons near flammable or combustible fumes,
Persons near any body of water that may present a drowning risk,
Persons known to have a pacemaker or known to be pregnant,
The Custody Division Manual may define criteria for a unique application of the

**Taser within a custodial setting.**

**Reporting the Use of the Electronic Immobilization Device:**

Authorized Department personnel discharging a Taser shall request the response of a supervisor if not already en route or on-scene.
The use of the Taser, either by utilizing the probes or the touch/drive stun mode, shall be reported as a "significant" use of force as defined in the Department Manual of Policy and Procedures, section 5-09/430.00, "Use of Force Reporting and Review Procedures."
Department personnel utilizing the Taser shall include a notation in their Mobile Digital (MDT) log fully explaining the necessity of their actions. In the event the Taser is "sparked" by personnel who do not complete an MDT log, personnel utilizing the Taser in this manner shall submit a memorandum to their direct supervisor fully justifying their actions.
Unit Commanders shall ensure that random audits documenting the usage of Tasers are conducted each month. Revised 08/10/05

**Code of Ethics:**
The Code of Ethics of any profession details the standard of conduct that identifies specific principles of desired behavior required of its practitioners. The profession of policing requires its members to adhere to specific standards in order to maintain the trust and respect of those who are served. Adherence to a

25

code of ethics is required to build and maintain morale, a sense of duty, effective standards of performance and community support. Peace officers are held to higher standards than others in the community. Although policing shares ideals with other professions, only peace officers are given the authority and power to detain and arrest others and to deprive them of their liberty while awaiting adjudication of their offense. It is essential that officers understand the importance of professional behavior.

*"We must create an atmosphere in which the dishonest officer fears the honest one, and not the other way around."*

Detective Frank Serpico,
Testifying before the Knapp Commission,
December 1971

*Report Writing taught to all Peace Officers throughout the United States:*

When writing a report, the minimum requirements to accomplish your job ethically and preserve the integrity of the criminal justice system are:

• Never falsify any portion of your report or modify any aspect of the report away from the factual truth.
• Objectively document every fact (or piece of evidence) known to you that could prove or disprove the event you are reporting. If you are not sure, include the fact or piece of evidence anyway and qualify it as possible evidence or investigative information.
• Be clear. A well-written report does not raise questions, it answers them.
• Write your report free of speculation or personal opinions. You are there to gather facts. You are responsible for the quality of each report you write. Each report is an opportunity to build or destroy your credibility. Always write precisely what happened to the best of your knowledge. A report determined by a court to be compromised or unethical not only topples your credibility, but your agency's as well - plus it opens the door to challenge every past enforcement action you have performed. Compromising your report is just not worth it. This will raise questions about your effectiveness as a peace officer and may ultimately lead to termination of your employment. It is your obligation to report incidents just as they occurred; anything else is unethical.

POST LD 1:

26

27

The adoption of a uniform code of ethics was one of the most progressive steps achieved by law enforcement. The *Law Enforcement Code of Ethics* was adopted in 1956 by the National Conference of Police Associations, representing some 180,000 police officers, and the International Association of Chiefs of Police. Many agencies and local police associations have adopted the code.

Very truly yours,

Ernest Burwell

# Ernest Burwell
## Police/Canine/TASER/SWAT

I joined the Los Angeles County Sheriff's Department in January 21, 1977 and retired August 14, 2004. After the academy I was assigned to Wayside Honor Ranch where I supervised inmates in maximum and minimum security, and supervise an inmate work crew taking care of the animals at the ranch. My next assignment was one which was not voluntary, and I was assigned to headquarters narcotics as an undercover buyer posing as a student at Pepperdine University in Malibu.

I returned to working the jails at Men's Central Jail in downtown Los Angeles, supervising inmates in a maximum security facility. My next assignment would be one of the toughest assignments on the Sheriff's Department. I was assigned to Lynwood as a patrol trainee. The area covered a large portion of South Central Los Angeles. I worked many different assignments at Lynwood Station such as jailer, watch deputy, traffic deputy, training officer, auto theft detective, and burglary detective.

I transferred several years later to Santa Clarita where I was a training officer. An unusual position came available which I transferred to. The position was in a rural area in the north end of Los Angeles County. The small town of Gorman had two resident deputies which had an area of over 350 square miles of area to patrol. The nearest back up was about an hour away. Interstate 5 is the main highway through California for travelers heading north. This assignment included a canine partner since the resident deputy works alone and all different hours.

After working Gorman with a canine, I transferred to the Special Enforcement Bureau, Canine Detail. My duties consisted of high risk felony suspect searches, armed misdemeanor suspect searches, article searches, SWAT calls, and training. While working as a canine handler, Aero Bureau asked me to assist them with a personnel shortage, knowing that I was a commercial helicopter pilot. I was transferred to Aero Bureau for one year. I returned to the canine unit which was decentralized for about one year and returned the Special Enforcement Bureau. I have been assigned to that position since.

*Assignments*

| | |
|---|---|
| 10/1977 | 16 week academy, class 183 |
| 5/1977 | Wayside Honor Ranch, Minimum Security, Main Central Jail |
| 5/1978 | Headquarters Narcotics Division, undercover buyer |
| 6/1979 | Lynwood Station, Patrol, Field Training Officer, Auto Theft |
| | Investigator, Burglary Detective. |
| 4/1983 | Santa Clarita Station, Field Training Officer |
| 1/1984 | Gorman Sheriff's Station, Canine handler, 350 Sq. mile rural area. |
| 1/1986 | Santa Clarita Station Canine handler |
| 1/1987 | Special Enforcement Bureau, Canine handler and assist SWAT |
| 4/1988 | Aero Bureau, Observer and Pilot, certified in reciprocating and |
| | turbine helicopters, commercial helicopter pilot. |
| 1/1989 | Lennox Sheriff's Station, Canine handler and assist SWAT |
| 1/1990 | Special Enforcement Bureau, Canine handler, Trainer, and assist |
| | on SWAT calls and warrant services |

*Patrol Training*

| | |
|---|---|
| 1/1984 | AR-15 training |
| 1/1985 | Off road vehicle driving |
| 9/1989 | Tactical communication |
| 6/1991 | Special Enforcement Bureau weapons training |
| 4/1993 | Benelli Automatic shotgun training |
| 3/1991 | Handling mentally ill persons |
| 4/1994 | Chemical agents |
| 4/1994 | Arwin training |
| 4/1994 | Sting ball training |
| 4/1994 | Diversionary device training |
| 4/1994 | Taser training |
| 5/1993 | Special Enforcement Bureau weapons training |
| 7/1993 | Special Enforcement Bureau weapons training |
| 9/1996 | Code 3 driving |
| 9/1996 | Sexual harassment training |

29

| | |
|---|---|
| 1/1998 | Oleoresin Capsicum training |
| 5/2000 | Vehicle pursuits and tactics |
| 6/2001 | Taser instructor training, Instructor Certification # 010626138631412871346C |
| 2/2003 | MP-5 training |
| 12/2003 | Medical services training |

*Canine Training and Education*

| | |
|---|---|
| 5/1984 | Los Angeles County Sheriff's Department basic canine training class, 160 hrs |
| 4/1985 | Canine seminar at San Simeon, 3 days |
| 1/1987 | Adlerhorst Police Canine Handler School, 160 hrs |
| 1/1988 | Los Angeles County Sheriff's SWAT school |
| 2/1989 | Los Angeles County Sheriff's Department canine training course, 6 weeks |
| 8/1989 | Los Angeles County Sheriff's Department canine training course, 4 weeks |
| 3/1990 | Long Beach Police Department Canine Training Course, 48 hrs |
| 8/1990 | Adlerhorst International POST recertification |
| 6/1991 | Canine Special Weapons Team School #1 |
| 11/1991 | California and Swiss search dog association disaster training, 1st Phase |
| 2/1992 | California and Swiss search dog association disaster training, 2nd Phase |
| 4/1992 | California and Swiss search dog association disaster training, 3rd phase |
| 6/1993 | Adlerhorst International legal update |
| 9/1993 | Adlerhorst PSD Legal Seminar |
| 9/1995 | Orange County Sheriff's Department Canine Handler Development |
| 10/1995 | Adlerhorst Police Dog Handler School 160 hrs |
| 11/1997 | POST K9 Team Evaluator's Course #3500-24040-97001 |
| 3/2003 | Adlerhorst Agitator School |
| 3/2003 | Adlerhorst Handler Development School, 40 hrs |
| 3/2003 | Adlerhorst Police Dog Handler School, 200 hrs |

*California POST Certified Canine Evaluator*

1991 to Present   POST certify approximately 75 canine teams for service

*Canine Training Lectures Received*

| | |
|---|---|
| 1/1985 | Palmdale Canine Training and Kennels, Bob McAdams |
| 1986 | Golden West Canine, Fred McNabb |
| 1986 | Alabama Kennels, Ted Sexton |
| 1987 | Adlerhorst International, David Reaver |
| 1991 | Bakersfield Kennels, Tony Barrios |
| 1993 | Adlerhorst International legal update, David Reaver |

*Worked the following Canines in Patrol and SWAT*

| | | | |
|---|---|---|---|
| 5/1984 | Orek | Shepherd | Retired due to hips 3RD handler |
| 10/1986 | K.C. | Rottweiler | Poor performance |
| 8/1987 | Arco1 | Belgian Malinois | Given to another handler while at Aero |
| 2/1989 | Olm | Shepherd | Died from tumor |
| 9/1990 | Arco2 | Belgian Malinois | Died from old age |
| 1998 | Fedor | Shepherd | Poor performance |
| 1998 | Rocky | Belgian Malinois | Died from old age |
| 12/2003 to 1/2004 | Oscar | Belgian Malinois | Taken by department |

*Los Angeles County Sheriff's Department Canine Trainer/Instructor*

1989 to 2003

31

Trained Sheriff's Deputies newly assigned to the canine unit to perform all functions as a canine handler, and to work in conjunction with SWAT and Aero Bureau. This included public lectures, demonstrations, and briefings.

*Competitions*

1993

Competed in the 1993 Police and Fire Summer Games

*Competitions Judged*

Judged the SWAT/K9 competition in Utah for Wendell Knope

*Canine Demonstrations Conducted*

150 Schools
200 LASD station demos
25 CHP and P.D. demos
50 Demos for Rotary clubs, Women's clubs, Boys and Girl Scout clubs, and handicapped schools

*A Few of the Departments I Have Trained Police Departments in California*

Monterey Park P.D.
Inglewood P.D.
San Diego S.D.
Shasta County S.D.
Ontario P.D.
Culver City P.D.
L.A.P.D.
Ventura S.S. and P.D.
Long Beach P.D.
Hawthorne P.D.

32

Fresno P.D.
El Monte P.D.
Burbank P.D.
Montebello P.D.
Railroad P.D.
San Fernando P.D.
Monrovia P.D.

*Canine Searches Conducted*

1984 to 2004
4000 area and building searches
50 missing person searches
10 dead body searches
500 SWAT calls
100 warrant services
1000 apprehensions

*Studied*

USPCA
Survey of Southern Police Departments using canines and the use of force
Bite ratios
Find ratios
Persons killed by canines, Robinette vs. Tennessee
POST
Bark and guard theory
Find and bite theory
Ways to compile canine statistics

*Reading materials*

Glen R. Johnson, Book of Tracking
Scent, Milo D. Pearsall
Police Product News
Training, The Manual, Cornel Conrad Most

33

*Commendations*

100 felony suspect search commendations for tactics
25 demo
10 citizens
50 various

*Bi monthly and weekly scheduled canine training hours*

5000 hours

*Daily training*

2 hours per shift, 4 shifts per week, for over 20 years

*Collateral duties*

Taser instructor
Maintain computer input of canine statistics
Canine POST evaluator
Maintain weapons training with SWAT
Generate monthly report to the Sheriff regarding all canine activity
Train newly assigned supervisors to canine unit

*Articles written*

Reprogramming the radio
Find and bite vs. find and bark
In house training
The canine training manual
Working canines in SWAT lecture

*Canine Vehicles*

Installed and wired the canine vehicles so audio prerecorded canine
announcements could be played from a cassette over the public address system in

34

Spanish and English. This allowed suspects to surrender and residents to go in their homes for safety.

*Super Sock Bean Bag*

Conducted test firings of the CTS Super- Sock 12 gauge projectile at various distances. The tests were recorded using high speed photography.

I assisted the Los Angeles County Sheriff's Department Training Bureau testing the bean bag and 37 mm Arwin by receiving shots.

Very truly yours,

Ernest Burwell

35

# Ernest Burwell

Police Consulting
P.O. Box 2083
Thompson Falls, Montana 59873
406-531-9223
ewbk94@gmail.com

## Prior expert testimony for Ernest Burwell:

During my nearly thirty year career with the Los Angeles County Sheriff's Department, I have testified in numerous criminal and civil trials which were required by the Sheriff's Department. I have been qualified as an expert witness regarding Canine, Taser, Super Sock Bean Bag, Less Lethal, and Police Use of Force in Federal and State Courts. I have testified in the following matters for by deposition or court trial testimony.

ARELLANES V ALBUQUERQUE CIV0900432BBRHS Attorney Zac Ives
ALBUQUERQUE NEW MEXICO

ATHETIS V ALBUQUERQUE 09CV00677PHXNVW Attorney Richard Treon
ALBUQUERQUE NEW MEXICO

BLAKE V LASD Attorney Justin Sanders
LOS ANGELES CA.

BLONDIN V SNOHOMISH C091487RSL Attorney Joseph Shaeffer
SNOHOMISH WA.

BOBO V CITY OF STOCKTON 209CV00753WBSGGH Attorney Steven Yourke
STOCKTON CA.

CLEMENT V CITY OF EAST CHICAGO POLICE DEPARTMENT 207CV35 Attorney Mike Polen
EAST CHICAGO IN.

DAVIS V KOOTENAI COUNTY SHERIFF'S DEPARTMENT, ID. CIV05280NEJL Attorney Larry Kuznets
KOOTENAI ID.

ENGLAND V LAS VEGAS METRO POLICE DEPARTMENT 207CV01238PMPGWF Attorney Cal Potter
LOS VEGAS NV.

EWING V LOS ANGELES POLICE DEPARTMENT No. CV 07-5556-GHK (JWJx)Attorney James
DeSimone
LOS ANGELES CA.

FLANNAGAN V GARDENA POLICE DEPARTMENT CV065600PSG Attorney Paul Hoffman
LOS ANGELES CA.

FULLER V RICHMOND POLICE DEPARTMENT *REFUSED CASE*
RICHMOND CA.

GONZALES V FRESNO CA. POLICE DEPARTMENT CIVF046371OWWSMS Attorney Weisberg
FRESNO CA.

CALO V SAN DIEGO POLICE DEPARTMENT CRIMINAL TRIAL
SAN DIEGO CA.

GUERRERO NEMECHEK V GARDEN CITY POLICE DEPARTMENT Attorney Boone
GARDEN CITY KANSAS

HESTON V SAN JOSE POLICE DEPARTMENT 505CV3658 Attorney John Burton, Peter Williamson
SAN JOSE CA.

JARVIS PAYNE V CITY OF CHICAGO 05L7032 Attorney Jason Gatzulis
CHICAGO IL.

KILZI V WEST COVINA POLICE DEPARTMENT CRIMINAL TRIAL Attorney Todd Krauss
COVINA CA.

KIM V SANTA CLARA C0900025RS Attorney Brian Gearinger
SANTA CLARA CA.

KIRBY V SANTA BARBARA COUNTY SHERIFF'S DEPARTMENT CRIMINAL TRIAL Attorney David
St. John
SANTA BARBARA CA.

LEE V NASHVILLE POLICE DEPARTMENT Case 306108 Attorney Joe Bednarz Jr.
NASHVILLE TN.

MARQUEZ V PHOENIX POLICE DEPARTMENT 208CV1132 Attorney Lynn Schumway
PHOENIX AR.

MCDONALD V NORCOR JAIL FACILITY THE DALLES OR. CV09416 Attorney Lynn Walsh
THE DALLES OR.

MILLS V HAMDEN POLICE DEPARTMENT 307CV01684CFD Attorney Jonathan Einhorn
HAMDEN CT.

MOLINA V CITY OF ALHAMBRA CV0602295DDP Attorney Todd Krauss
ALHAMBRA CA.

MOMENI ORANGE COUNTY SHERIFF'S DEPARTMENT 06CC12033 Attorney Gary Casselman
SANTA ANNA CA.

MORRISON V MUSKINGUM COUNTY SHERIFF'S DEPARTMENT C206CV283 Attorney Michael
Rourke
ZANESVILLE OH.

NELSON V ALBUQUERQUE 10553BB/DJS Attorney Justin Pizzonia/Sharon Hawk
ALBUQUERQUE NM.

ONTIVEROS ROSENBERG POLICE DEPARTMENT 406CV03293 Attorney Jorge Borunda
ROSENBERG TX.

OVERTON V MARION COUNTY SHERIFF'S DEPARTMENT 106CV1513 Attorney Richard Waples
INDIANAPOLIS IN.

PARKS V DAVIS POLICE DEPARTMENT CITATION 125352 Attorney Michael Jones
DAVIS CA.

PHILLIP V FRESNO POLICE DEPARTMENT CIV-F-04-6729-AWI TAG Attorney Jacob Weisberg
FRESNO CA.

PIERCE V CITY OF SALEM, OR. CV061715ST Attorney David Park
SALEM OR.

RAYBOULD V ROSEVILLE POLICE DEPARTMENT SC# 62045322 Attorney Michael Jones
ROSEVILLE CA.

SOLIS V BREWSTER CV08021EFS Attorney Janet Rice
BREWSTER WA.

TUCKER V LAS VEGAS METROPOLITAN POLICE DEPARTMENT Attorney John Funk
LAS VEGAS NV.

WALKER V LAS VEGAS METROPOLITAN POLICE DEPARTMENT Attorney Nadia von Magdenko
LAS VEGAS NV.

# Ernest Burwell

### Police Consulting
P.O. Box 2083
Thompson Falls, Montana 59873
406-531-9223
ewbk94@gmail.com

My Fee Schedule is as follows:

Travel expenses as actually incurred, such as: lodging, reasonable meals, and flight/driving costs. Reimbursement may be required for loss of pay due to closing my business for this service.

- All case review, consulting, and writing of expert opinions (such as Rule 26 reports) at $250.00 per hour.

- All testimony (either at trial or deposition) at $300.00 per hour, with a four hour minimum required.

- A non refundable retainer fee of $3000.00 when initially retained which is used against the above listed fees. Subsequent billings at the rates specified.

There is no formal contract required. My Federal Tax ID Number is **20-4546542**